**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**M & B HEADWEAR CO., Inc.,**
Respondent.

No. 9794.

United States Court of Appeals
Fourth Circuit.

Argued May 3, 1965.

Decided July 1, 1965.

Albert V. Bryan, Circuit Judge, dissented in part.

Labor Relations Act, 29 U.S.C.A. § 158, in that certain of its employees were interrogated concerning their union membership, threatened with economic reprisals, subjected to surveillance and, in the case of two of their number, discriminated against in regard to hire and tenure.

■ We find substantial evidence in the record considered as a whole to support the Board's findings as to interrogation, surveillance and discrimination in regard to hire and tenure, and accordingly direct enforcement of the order so far as it pertains to those matters. Universal Camera Corp. v. N L R B, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

Respondent is engaged in Richmond, Virginia, in the manufacture of headwear for men, particularly military caps. In the spring of 1963, contemporaneously with the employer's transfer of its operations to a new plant, the union began its organizational activities. On June 17, 1963, the union filed a representation petition for all of the respondent's production workers and in an election on August 28, 1963, the union won 119 to 73.

Allen M. Hutter, Attorney, National Labor Relations Board (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Warren M. Davison, Attorney, National Labor Relations Board, on brief), for petitioner.

Thomas N. Gasque and Alexander B. McMurtrie, Jr., Richmond, Va., for respondent.

Before HAYNSWORTH, Chief Judge, and SOBELOFF and BRYAN, Circuit Judges.

SOBELOFF, Circuit Judge:

The National Labor Relations Board seeks the enforcement of its order of May 15, 1964, requiring the M & B Headwear Co. to cease and desist from threatening and interrogating its employeees and to reinstate with back pay two of its dismissed employees. We are thus called upon to deal with the familiar question of whether there is in the record substantial evidence to support the Board's determination. The contested findings are that the respondent violated sections 8(a) (1) and (3) of the National

*Interference, Coercion and Restraint*

Shortly after the respondent moved to its new location and the union began its organization campaign, the employer's president, Samuel Bigler, conducted a series of at least ten interviews in his office with some of his production employees. In these discussions the employees' opinion of the new facilities and working conditions was solicited. No objection is made to this aspect of the interviews. The president went further, however. On June 4, 1963, Agnes Watson was questioned as to her knowledge of the existence of the union and whether she had attended union meetings. A few days earlier, Bigler accused two other employees, Annie Porter and Josephine Proctor, of union membership and presence at union meetings. In his testimony Bigler conceded that he made his adamant anti-union position known to the employees and that he had never be-

fore had occasion to conduct interviews with employees.

No reason was offered to justify questioning the employees about their union affiliation nor was anything said to the employees in these interviews to assure them that they were safe from reprisals arising from their union affiliation. In fact, as we shall see, two employees were later released because of their union affiliation.

■ Whenever a high executive calls production line workers into his office and questions them about their union activity in an atmosphere of "unnatural formality,"[1] there is inevitably an implication of coercion. When such a procedure is accompanied by manifest employer hostility to the union and discriminatory firings, the Board is well justified in finding that the employees have been coerced in their organizational activities.

■ We are unable, however, to accept the separately grounded finding that the employees were threatened with economic reprisals. On one occasion, unrelated to events above recited, President Bigler told an employee that he knew of a plant with a union shop that hired girls for three months and then laid them off. On still another occasion he told an employee about a plant in New York that was forced out of business because of a union and that he, Bigler, thought his company would not be able to bid on government contracts once the union came in.

■ An employer is free to inform his employees of the results that may be anticipated if a union is voted in. It is only fair to the employer and employees themselves that they be shown the other side of the picture. An employer should be permitted to stress the disadvantages of union representation "so long as the consequences he mentions are ones which may actually and lawfully take place if the union is voted in." Bok, The Regulation of Campaign Tactics in Representation Elections under the National Labor Relations Act, 78 Harv.L.Rev. 38, 79 (1964). If we assume that one purpose of the National Labor Relations Act is to enable workers to act as rationally as possible in deciding whether to unionize, then it is desirable that the employees be provided with information clearly pertinent to the decision they will be called upon to make. Such communications, if free from coercive overtones, are not illegal.

The further finding that the employer was guilty of surveillance of its employees' union activities was amply supported in the record. It is conceded that a supervisor drove past the home of an employee, Rena Vaughan, while she was welcoming other employees to a union organizational meeting. There was testimony that the car slowed down when it came to the Vaughan house and returned again that night. It is conceded that the supervisor told the driver of the car to take a route passing by the employee's house. Furthermore, another employee testified that she had informed the supervisor of the location of the meeting shortly before the alleged surveillance took place. Before the Examiner, the supervisor's reply was that she could not recall whether she had been told of the meeting place. The finding of surveillance was clearly warranted.

### The Discriminatory Discharges

Two employees, both active in the organizational campaign, were discharged before the certification election. The Board found that both were released because of their union activity, and the evidence supports this determination.

Agnes Watson had been employed by the respondent for 17 years as a floorgirl, a job that required her to distribute work among other employees. In all this long period there was no complaint about her work. In fact her request in 1962 that she be transferred to a sewing job was denied on the express ground that she was too valuable as a floor-

---

1. Bourne v. NLRB, 332 F.2d 47, 48 (2d Cir. 1964).

girl. As noted above, she was one of the employees called into the president's office in early June, 1963, and interrogated about the union. Six days after this interview she was transferred without notice to a sewing job for which she had no experience. There is evidence that the machine supplied her was defective and that her supervisor persistently harassed her. After failing to meet her quota Watson was fired in mid-August, 1963.

New employees are usually given three months to master the operation of the sewing machine before being assigned a quota, but Watson was assigned and held to a quota immediately. Other tolerances allowed new employees were not observed in Watson's case. When notified that she was to be dismissed Watson asked to be allowed to return to her old job in which her performance had been unexceptionable for 17 years. She was told this was impossible because the job had been filled by a new employee. A fellow employee thereupon pointed out to Bigler that the new floorgirl was not doing her job properly. This only caused the president to shout that he did not want anybody telling him how to run his business, the same remark he repeated continually when discussing the union in the course of the above-mentioned interviews.

■■ An employer may dismiss an employee for any reason he chooses except the employee's union activity. Determining the legality of a dismissal necessarily involves an appraisal of the employer's motives. In these cases motivations are seldom expressly avowed, and avowals are not always candid. There thus must be a measure of reliance on the administrative agency knowledgeable in labor-management relations and on the Trial Examiner who receives the evidence firsthand and is therefore in a unique position to determine the credibility of the witnesses. Where Examiner and Board are in agreement there is an increased presumption in favor of their resolution of the issue.

The determination here was that the dismissal of Agnes Watson was predicated upon her union activity. There is ample evidence to support this view, for the transfer to a new job came without explanation and so soon after the company's president accused her in the interview in his office of being a prime mover in the organization campaign. It is the more difficult to accept this precipitous transfer as one motivated by normal considerations of plant management when it is remembered that Watson's request for such transfer had been refused a year earlier with the explanation that she was too valuable as a floorgirl. There was no testimony contesting the proof that she was treated more harshly in her new job than other employees hired for the same work. The Board's order reinstating Watson with back pay must be enforced.

The discharge of Rena Vaughan gives rise to a somewhat different problem. She was the employee who first contacted the union and it was at her house that the organizational meeting, spied on by one of respondent's supervisors, was held. Six days after the meeting, at 8:30 on the morning of June 10, 1963, she was transferred from the clipping to the blocking department. It is worth noting that this transfer occurred on the same day that Agnes Watson was shifted to a sewing job. The Trial Examiner found on the basis of adequate evidence that there was plenty of work in the clipping department when Vaughan was transferred out.

At the end of the day a supervisor informed Vaughan that she was being laid off because there was insufficient work in the blocking department and she was told, as found by the Trial Examiner, that it was unfair of her to attempt to organize the plant without telling the company officers. Vaughan was not called back to work even though the employer was hiring, and when she applied for an advertised "operator's" job she was turned down because she had been trained as a "blocker," though she was not rehired in this capacity. There is no

indication that Vaughan's work or deportment was unsatisfactory in any way before she was laid off. We find sufficient support for the Board's conclusion that the layoff was discriminatory. N L R B v. Eastern Die Co., 340 F.2d 607 (1st Cir. 1965).

The employer contends, however, that its misconduct, even if originally violative of the Act, is absolved by Vaughan's later insubordination. It is conceded that she was angered by her layoff, that she threatened to harm the supervisor who had observed her union activities, and that she was rude to a vice-president several days later, telling him to shut up when he intruded upon her discussion with the president about her being rehired. We in no way condone insubordination and in normal situations it would be a justifiable ground for dismissal. But we cannot disregard the fact that the unjust and discriminatory treatment of Vaughan gave rise to the antagonistic environment in which these remarks were made.

■ An employer cannot provoke an employee to the point where she commits such an indiscretion as is shown here and then rely on this to terminate her employment. See N L R B v. Tennessee Packers, Inc., 339 F.2d 203 (6th Cir. 1964). The more extreme an employer's wrongful provocation the greater would be the employee's justified sense of indignation and the more likely its excessive expression. To accept the argument addressed to us by the company would be to provide employers a method of immunizing themselves from the only real sanction against violations of section 8(a) (3). Reinstatement in the instant case is not, as the employer puts it, a reward to the employee for insurgency. Rather, as we see it, refusal to reinstate her would put a premium on the employer's misconduct.

■■ We hold only that when a layoff is discriminatory a rehiring of the injured employee cannot be avoided by reliance on her later unpremeditated and quite understandable outburst of anger that in no way harms or inconveniences

the employer. Such an employee should not be deprived of her job, but is to understand that she is to observe the requirements of discipline and good manners. Justice in this instance demands the employee's reinstatement with the strict admonition that she will be expected to conduct herself properly and with due respect to supervisory personnel. After reinstatement any further misconduct will subject her to disciplinary action as it would any other employee.

The order of the Board will be enforced in part as indicated in this opinion.

Enforced in part, denied in part.

ALBERT V. BRYAN, Circuit Judge (dissenting in part):

How the Board could order reinstatement of Rena Vaughan is incomprehensible. On appearing for work on the morning of June 10, 1963, she was sent from her duty station in the clipping section to see Supervisor Dorothy Ellis, who then put her to work blocking hats. She had been trained by the company as a blocker and had worked in that capacity from the inception of her employment in June 1962 until March 1963 when she went to the clipping department.

Near the end of the day Trivette, the first floor supervisor, advised Rena Vaughan that she would be *laid off* at the close of the day because of insufficient work in the blocking section. Vaughan asked about her vacation pay and complained that her lay-off was unfair because there was still work to be done in clipping. Trivette commented on her union activities and asked if she had been holding union meetings in different homes. Vaughan refused to reply.

Just before quitting time, Vaughan remarked to Supervisor Ellis about her discharge, but Ellis assured her that it was only a temporary suspension and she would receive her usual vacation pay. Whereupon Vaughan accused Ellis of spying on a union meeting which had been held at Vaughan's home a few

nights earlier. She said Ellis was then in a car owned and driven by her church's minister. Ellis admitted this to be true, explaining that they were coming from a church meeting. Then Vaughan charged Ellis with "having improper relations with the minister" and stated that she was going to tell the church and the minister's wife of it. She denounced Ellis as "a dirty woman" and declared that neither Ellis nor Trivette were going to sleep any more at night. The minister testified that he had in truth driven Ellis along the street of Vaughan's home on this particular occasion, and had done so a number of times before when he drove her back from church meetings. The Board finds all these incidents to be true.

On June 17, a week after Vaughan's suspension, she returned to the respondent's plant in answer to a job advertisement. On this visit she was quoted as stating "I am going to beat Dorothy Ellis if it is the last thing I do". At this employment interview when a vice president of the company sought to interpose, he was told by Vaughan several times to "shut up" for she was talking to someone else. In leaving, she made more insulting remarks to other employees.

Even if the worst implication be drawn from the change of assignment and her lay-off—that it was punishment for her pro-union activity—surely her immediate and subsequent deportment forfeited any right to reinstatement. However mistaken the decision of the supervisors, her threats to disgrace and attack them personally should not be countenanced.

But even further, if this deportment is to be condoned as a justifiable, forgivable, emotional reaction to her suspension, her outburst a week later can hardly be readily ignored. The interval provided adequate cooling time. Moreover, she returned to procure a different position. Nevertheless she chooses to insult —and repeatedly—a vice president while at the same time asking for employment. This behavior scarcely evinces a willingness to work cooperatively or to accept the discipline of the plant. It was defiance of the employer at the outset of reemployment—an attitude warranting immediate rejection of her application.

Notwithstanding, the Board finds the *employer* at fault. Then it rewards Vaughan's affronts and insurgency by reinstatement. Payment of unearned wages is ordered not simply for the period between her suspension and final termination of employment but beyond the latter event. Obviously management's authority in the factory is effectually devastated. This I cannot believe compelled by common sense or the National Labor Relations Act. To think the kindly admonition of the Court that in the future she really ought to behave will restrain her and return control to the owner is to scrap experience.