NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

MUELLER BRASS CO., a subsidiary of
U. V. Industries, Inc., Respondent.

No. 73–3014.

United States Court of Appeals,
Fifth Circuit.

Oct. 4, 1974.

Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., John J. A. Reynolds, Jr., Director, Region 26, N. L. R. B., Memphis, Tenn., Aileen A. Armstrong, Washington, D. C., for petitioner.

Emile C. Ott, M. Curtiss McKee, Jackson, Miss., for respondent.

Before GEWIN, THORNBERRY and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

We review a decision of the National Labor Relations Board (the Board) adjudging the respondent, Mueller Brass Company, a subsidiary of U. V. Industries, Inc. (Company) guilty of violations of Sec. 8(a)(1) & (3) of the National Labor Relations Act, Title 29, U.S.C., Sec. 158(a)(1) & (3) (the Act). The Board petitions for enforcement of its Decision and Order[1] requiring (1) that the respondent employer cease its violations of the Act, and (2) grant reinstatement with back pay to its employee George Blanton who was found to have been discharged in violation of the Act. We grant the petition in each respect.

## The Facts

This case began with an alleged violation by employee Blanton of Mueller's "no-solicitation" rule, which provided as follows:

> No employee shall solicit or promote subscriptions, pledges, memberships or other types of support for any drives, campaigns, causes or organizations on company property during working time without express written permission from the Company.

The incident in question occurred the night of September 12, 1972, as Blanton

---

1. Reported at 204 NLRB No. 105.

and others working the "graveyard" shift (11 P.M. to 7 A.M.) were reporting for work at the plant in Fulton, Mississippi. Blanton's duty that evening was as a member of the crew assigned to the Number One Block in the Mueller plant. It was routine procedure for the members of this crew to clock in on the way from the dressing room to the Number One Block area and then to wait in the block area to receive their work assignments for the evening from their supervisor, Larry Gray. The crew members did not know in advance of receiving their assignments what they were to do on any given evening.

On the night in question, Blanton testified that he had been to a Union[2] meeting at 7:30 P.M. The meeting resulted in a decision by several members of the graveyard shift that they would wear union badges and other union insignia to work that evening as a show of open support for unionization of the Mueller plant. This was apparently the first time during this particular organizational campaign that employees had openly demonstrated union support.[3]

Blanton testified that he reported to work on the night of the 12th sometime between 10:45 and 11:00 P.M. He clocked in and then proceeded to the vending machine area where he purchased a cup of coffee. As he was standing in the vending machine area, he was approached by a fellow crew member Randy Reich. According to Blanton, Reich inquired where Blanton had gotten his Union button. Blanton responded that he had gotten it at the union meeting and asked Reich whether he wanted one. Reich answered that he did and Blanton took an extra pin from his pocket and gave it to Reich. This is not the only version of events that evening, however.

Supervisor Larry Gray's account of the incident was that Blanton passed the button to Reich after the two men had reported to the Number One Block area and just prior to their receiving their shift work assignments from Gray. Blanton testified that he did not pass the button to Reich in the work area. He did ask Reich where his button was when he noticed that Reich was not wearing it, and Reich supposedly showed the button in an extended hand to Blanton. Whatever the correct version, Blanton was instructed by Gray to report to the office of the night foreman, Paul Stamper, as the other men were given their work assignments. After a brief time, Stamper arrived and confronted Blanton with the accusation that he had passed the union button to Reich during work time in violation of the company no-solicitation rule. Blanton denied this and asserted that he had given Reich the button in the vending machine area. Stamper thereafter questioned both Gray and Reich. Reich apparently told Stamper that Blanton had given him the button in the dressing room, which was at variance with Blanton's statement that the button had been passed in the vending machine area, but still supported Blanton's denial that the button had been passed in the Number One Block area. Stamper decided that Blanton's conduct required suspension, in accordance with company regulations, pending an investigation into the incident and resolution of the inconsistent explanations of the occurrence. Stamper, accordingly, ordered Blanton to clock out and go home for the evening.

On his way out of the building, Blanton sought out Gray in the Number One Block area and accused him of being a "damn liar." He further abused Gray verbally and invited him outside to settle matters between them. Gray declined the invitation. Blanton thereafter returned to Stamper's office and asked that he be fired rather than suspended

---

2. United Steelworkers of America, AFL–CIO–CLC (Union).

3. The Union had conducted a prior organizational campaign in 1971 and had lost a representation election in September 1971. The union again initiated organizational efforts during the summer of 1972.

because he did not want the uncertainty whether he would be discharged hanging over his head. Stamper replied that company rules required that a hearing be held before a discharge could be ordered, and again instructed Blanton to leave the plant. A hearing was subsequently held on September 25th, which Blanton did not attend. He testified that he was unable to attend because of the funeral of a friend. The decision was made to discharge Blanton on grounds: (i) that he had violated the company's no-solicitation rule; (ii) that Blanton had been insubordinate to his supervisor, Gray, after his suspension; and (iii) that Blanton had requested that he be discharged in his post-suspension encounter with foreman Stamper.

### The Hearing Below

A hearing was held before an Administrative Law Judge (ALJ) in early January 1973 regarding Blanton's discharge and other alleged violations of the Act, *supra*. The ALJ found that Blanton's suspension and discharge for violation of the company no-solicitation rule constituted violations of Sec. 8(a)(1) of the Act. The judge concluded that, even accepting supervision Gray's account of the button-passing incident as true, the period during which Blanton gave Reich the union button was "non-work" time under the rules announced in NLRB v. Monarch Tool Co., 6 Cir. 1954, 210 F.2d 183, cert. denied 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1109, and NLRB v. Essex Wire Corp., 9 Cir. 1957, 245 F.2d 589. The ALJ further concluded that the discharge could not be justified either on the basis of Blanton's post-suspension outburst against supervisor Gray or on the basis of his request to general foreman Stamper that he be discharged since this conduct was precipitated by the unlawful suspension. NLRB v. M & B Headwear Co., Inc., 4 Cir. 1965, 349 F.2d 170.

The ALJ found additionally that the suspension and discharge constituted violations of Sec. 8(a)(3) of the Act. She based this conclusion on a finding that the company had a distinct anti-union animus and that, absent this animus, it would not have applied the no-solicitation rule so strictly as to reach Blanton's handing a union button to a fellow employee during the period that the two were waiting to receive their work assignments. The finding of anti-union animus was predicated upon testimony of plant manager Charles Lymburner that he "[had] not made it any secret of my opinion that we do not need a union at Mueller Brass Company," and upon a finding that plant industrial relations manager Farris Gregory had made statements to at least two employees indicating that Union organizers were being blacklisted by employers in the area and that Mueller Brass might be forced to shut down if it were unionized.[4]

Based on her findings and conclusions, the ALJ issued a cease and desist order with posting of notice requirements. The order directed that Blanton be offered reinstatement with back pay from the date of his unlawful suspension. On application to the Board by both parties, the Board adopted the findings and conclusions of the Administrative Law Judge and directed the Company to comply with the Order.

■■ This case presents close questions in several respects. Enforcement of the Board's order should follow if its findings are supported by substantial evidence in the record considered as a whole and are correct as a matter of law. Title 29, U.S.C., Sec. 160; NLRB v. Universal Camera Corp., 1950, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. It is not our function to overturn a Board choice between two equally plausible inferences from the facts if the choice is

---

4. These comments by Gregory, some of which were made to Blanton during the course of an interview several days after his suspension, were made the basis of a separate Sec. 8(a)(1) violation in the NLRB order.

reasonable, even though we might reach a contrary result if deciding the case *de novo*. NLRB v. United Insurance Co., 1968, 390 U.S. 254, 88 S.Ct. 988, 19 L. Ed.2d 1083; NLRB v. Standard Forge & Axle Co., 5 Cir. 1969, 420 F.2d 508, cert. denied 400 U.S. 903, 91 S.Ct. 140, 27 L.Ed.2d 140. We turn to a review of the Board's Decision and Order in the light of these rubrics.

### Blanton's Suspension and Discharge

**The Sec. 8(a)(1) Violation.** The Company disputes the ALJ's finding that its suspension and discharge of Blanton violated Sec. 8(a)(1) of the Act because the alleged infraction of the Company no-solicitation rule occurred during non-working time. It emphasizes that the rule applies by its terms to solicitation "during working time or in working areas," and argues that because the solicitation here occurred in what was unquestionably a working area, the Board finding must be reversed under our prior decision in Patio Foods v. NLRB, 5 Cir. 1969, 415 F.2d 1001. The ALJ and the Board rely upon the fact that Blanton and Reich had not yet received their work assignments for the evening and had not engaged in actual work, arguing that their Sec. 8(a)(1) finding is supported by the rationale underlying the Fourth Circuit decision in Exide Alkaline Battery Division of E. S. B., Inc. v. NLRB, 4 Cir. 1970, 423 F.2d 663, enf'g 177 NLRB 778.

In *Patio Foods* this court was faced with handbilling on an extensive scale in a truck loading area where employees were actively at work. Attempts by the plant manager to halt the distribution met with resistance, and there was evidence that both the distribution and the argument between the plant manager and the handbilling employees resulted in distraction and interruption of employees working in the truck loading area. On these facts, we overruled the Board's finding that the distribution took place in a non-work area and refused enforcement of the Board's order, despite the fact that the employees distributing and receiving the handbills had apparently clocked out for the day.

In *Exide Alkaline Battery,* the Fourth Circuit was faced with a less blatant case of solicitation. They noted, in upholding a Board finding of 8(a)(1) & (3) violations, that one employee had been discharged for violating a no-solicitation rule while waiting in line to clock out at the end of the work day. The court emphasized that the Company had a strong anti-union animus which had manifested itself in the interrogation and threatening of employees. Accordingly the court granted enforcement of the Board order.[5]

We view the facts of the instant case more closely aligned with those in *Exide Alkaline Battery,* and hold that the period during which Blanton passed the union button to Reich, accepting the Company version of the incident, constituted nonworking time. Even though the alleged solicitation, under the Company version, occurred in a working area, the two individuals involved, Blanton and Reich, had not yet received their work assignments, and there was no evidence introduced that the mere passing of a union button resulted in or had the potential for the type of disruption which took place in the *Patio Foods* situation. See NLRB v. Peyton Packing Co., Inc., 5 Cir. 1944, 142 F.2d 1009, enf'g 49 NLRB 828, cert. denied 323 U.S. 730, 65 S.Ct. 66, 89 L. Ed. 585.[6] Accordingly, we determine

5. The Board in its decision and order at 177 NLRB 778 found that the Company's interpretation of the no-solicitation rule "unlawfully restricted solicitation." The interpretation was deemed unlawful because it: "allow[ed] solicitation during times when the employees were on scheduled nonwork time such as coffee and lunch breaks, but not when they were on other nonwork time." Id. This is precisely the situation with which we are here confronted.

6. The Company argues that the Board approach equates work time with time during which manual labor is actually being performed and that, under this approach, solici-

that the board's finding of violation of Sec. 8(a)(1) of the Act by Blanton's suspension and subsequent discharge (to the extent based on violation of the Company's no-solicitation rule) is supported by substantial record evidence and is correct as a matter of law.

*The Sec. 8(a)(3) Violation.* The Company contends that the record does not support the Board's finding that Blanton's suspension and discharge constituted discrimination in violation of Sec. 8(a)(3) of the Act. As the ALJ recognized, the record contains only scant evidence regarding prior Company policy under the no-solicitation rule. It appears that no one had ever applied for permission to solicit from the Company. Nonetheless, there was some evidence that employees had sold cigarettes and other items during work time, although it is not clear that such practice was ever brought to the attention of management. No one had ever been discharged for violation of the rule, and there was no indication that it had ever been applied. The ALJ found that the application of the rule to Blanton's button passing before the commencement of work would not have been made absent the Company's strong anti-union animus, indicating that the Company had a discriminatory intent in suspending and later discharging Blanton for violation of the rule.

██ There is no question from the record that the Company was strongly anti-union. Nonetheless, we have held that a finding of discriminatory intent is not supported solely by a showing that a discharged employee was pro-union and his employer anti-union. Nix v. NLRB, 5 Cir. 1969, 418 F.2d 1001, 1008. A finding of discriminatory motive is not dependent on a showing of prior practice under a particular company rule, NLRB v. Hertz Corp., 5 Cir. 1971, 449 F.2d 711 (sick leave provision), and discriminatory motive may be found even where the company has a valid ground for discharge, NLRB v. Linda Jo Shoe Co., 5 Cir. 1962, 307 F.2d 355. As we noted earlier, we will not disturb a Board choice between two equally plausible inferences of discriminatory or non-discriminatory conduct. NLRB v. United Insurance Co., supra; NLRB v. Standard Forge & Axle Co., supra; NLRB v. Coats & Clark, Inc., 5 Cir. 1956, 231 F.2d 567. On this record we are not justified in a conclusion that the Board finding is unreasonable or without substantial support. Accordingly, we affirm that portion of the Board's Decision and Order finding Blanton's suspension and discharge to have been in violation of Sec. 8(a)(3) of the Act.

*The Provoked Insubordination.* The Company also contends that its discharge of Blanton was in any event justified by Blanton's abusive confrontation with supervisor Gray following Blanton's suspension for solicitation, citing NLRB v. Soft Water Laundry, Inc., 5 Cir. 1965, 346 F.2d 930; and NLRB v. Louisiana Mfg. Co., 8 Cir. 1967, 374 F.2d 696. The Company further argues that the Board's order for reinstatement of Blanton with back pay is inappropriate in the circumstances of his insubordination under NLRB v. R. C. Can Co., 5 Cir. 1965, 340 F.2d 433.

With regard to Blanton's insubordination as a ground for discharge, we think that this case is closer factually to NLRB v. M & B Headwear Co., Inc., 4 Cir. 1965, 349 F.2d 170, than to *Soft Water Laundry* and *Louisiana Mfg*. In

---

tation would be permitted during such events as company meetings. We do not so construe the Board's finding. Here there was a customary nonworking interval after the employees on the Number One Block crew reported to their work area and before they were given their work assignments for the night by the supervisor Gray. This customary nonwork interval is fairly indistinguishible from the time period before clocking out

in *Exide Alkaline Battery* and from customary breaks and lunch periods. Moreover, we note that the Company's fears concerning undue extension of the nonworking time concept would be blocked by our ruling in *Patio Foods*, supra that an employer is justified in enforcing a no-solicitation rule against disruptive activities in an area where employees are working or performing company functions.

*M & B Headwear* the discharged employee had been transferred from one section of the plant to another at the beginning of the work day. At the close of the day she was informed that she was being laid off because there was insufficient work in the section to which she had been transferred. Several days later, she was refused employment in response to an ad in which the employer sought applicants for a different position than the one to which she had been transferred. Both at the time of her lay-off and at the time of her response to the advertisement, the employee engaged in insubordinate and vituperative attacks upon her superiors, especially her immediate supervisor in the department to which she had been transferred. In rejecting the company's citation of this conduct as a valid ground for discharge, the majority opinion of the Fourth Circuit stated:

> An employer cannot provoke an employee to the point where she commits such an indiscretion as is shown here and then rely on this to terminate her employment. . . . The more extreme an employer's wrongful provocation the greater would be the employee's justified sense of indignation and the more likely its excessive expression. To accept the argument addressed to us by the company would be to provide employers a method of immunizing themselves from the only real sanction against violations of section 8(a)(3).

> \*     \*     \*     \*     \*     \*

> We hold only that when a layoff is discriminatory a rehiring of the injured employee cannot be avoided by reliance on her later unpremeditated and quite understandable outburst of anger that in no way harms or inconveniences the employer.

349 F.2d at 174 (citations omitted). A similar approach is appropriate here.

■ Blanton's abusive outburst at Gray immediately following upon Blanton's suspension on grounds which he hotly contested. His indignation at Gray was understandable. Expression of his anger in the language of the mill is not nearly as shocking to us as respondent's counsel would suggest. What we find more significant is Blanton's return to the plant two days later for a lengthy and unheated discussion with plant industrial relations manager Gregory. Blanton's acrimony at his suspension was not manifested in uncivil fashion at this or any subsequent time. In sum, Blanton's outburst was spontaneous and was provoked by the unlawful conduct of his employer.

The cases relied on by the Company are distinguished on the basis of these circumstances. NLRB v. Soft Water Laundry, supra, and NLRB v. Louisiana Mfg. Co., supra, both involved unprovoked outbursts of abusive and threatening language by the discharged employees. The element of justification is not present in either case. In NLRB v. R. C. Can Co., supra, it was established by the Hearing Examiner that the use of abusive and threatening language was made several days after the employee had been discharged and was "deliberate and premeditated." *R. C. Can* hence involved no spontaneous outburst of the type with which we are concerned here. We therefore grant enforcement of that portion of the Board order requiring the respondent Company to offer reinstatement with accrued back pay and interest to Blanton from the time of his unlawful suspension and discharge.

■ Finally, we perceive no serious merit in the Company's contention that the statements made by Industrial Relations Manager Gregory to employees Blanton and Rogers were not coercive in violation of Sec. 8(a)(1) of the Act. See Radio Officers' Union v. NLRB, 1954, 347 U.S. 17, 44–45, 74 S.Ct. 323, 338, 98 L.Ed. 455, 479–480.

The Board's Order is directed to be enforced in all respects.

Enforced.