## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## MUELLER BRASS CO., a subsidiary of U. V. Industries, Inc., Respondent.

### No. 74–1840.

United States Court of Appeals, Fifth Circuit.

March 17, 1975.

---

**706**

Elliott Moore, Deputy Associate Gen. Counsel, Charles P. Donnelly, N.L.R.B., Washington, D. C., John J. A. Reynolds, Jr., Director, Reg. 26, N.L.R.B., Memphis, Tenn., for petitioner.

Emile C. Ott, M. Curtiss McKee, Jackson, Miss., for respondent.

Before COLEMAN, CLARK and RONEY, Circuit Judges.

1. 29 U.S.C.A. § 158(a)(1).
2. 29 U.S.C.A. §§ 158(a)(1) and (a)(3).

RONEY, Circuit Judge:

This is a typical NLRB enforcement proceeding. The applicable law is settled and the sole question for us on review is whether or not the record contains substantial evidence to support two findings of the Board: *first*, that the Company created the impression of surveillance of its employees' Union activities; and *second*, that a single employee's three-day suspension occurred because of his Union activities. Failing to find such evidence, we deny enforcement.

The National Labor Relations Board (the Board) adjudged the respondent, Mueller Brass Company, a subsidiary of U. V. Industries, Inc. (the Company) guilty of violating Section 8(a)(1) of the National Labor Relations Act (the Act)[1] in a surveillance incident involving one employee and of violating Sections 8(a)(1) and (a)(3) of the Act[2] in a separate incident involving the suspension of another employee. The Board petitions for enforcement of its Decision and Order[3] requiring that the Company (1) cease its violations of the Act, and (2) make the suspended employee whole for any loss of earnings suffered as a result of the Company's discrimination against him for Union activities.

The Board's determination must be sustained if supported by substantial evidence. NLRB v. Brown, 380 U.S. 278, 85 S.Ct. 278, 13 L.Ed.2d 839 (1965); Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). If the Board's decision is based upon such relevant evidence as might be accepted as adequate by a reasonable person, we are not at liberty to deny enforcement merely because the evidence may also reasonably support other conclusions or because we might have reached a different conclusion had the matter come before this Court *de novo*. NLRB v. United Insurance Co., 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968); NLRB v. O. A: Fuller Super Markets, Inc., 374 F.2d 197

3. The Board's Decision and Order are reported at 208 NLRB No. 76 (1974).

(5th Cir. 1967); NLRB v. Camco, Inc., 369 F.2d 125 (5th Cir. 1966). Although the scope of our review is thus limited, we may deny enforcement of an order of the Board if, after full review of the record, we are unable conscientiously to conclude that the evidence supporting the Board's decision is substantial. Universal Camera Corp. v. NLRB, 340 U.S. at 488, 71 S.Ct. 456; NLRB v. O. A. Fuller Super Markets, Inc., 374 F.2d at 200.

### Surveillance—Employee Stockton

The facts which formed the basis for the Board's decision that the Company created the impression of surveillance of Union activity in violation of Section 8(a)(1) of the Act are brief. Abe Rubel Stockton worked as a janitor from May 1972 until February 27, 1973, in the Company's plant at Fulton, Mississippi, where the Company, a manufacturer of copper tubing, employed approximately 350 workers. The United Steelworkers of America, AFL–CIO–CLC (the Union) has been trying to organize the Company's employees at the Fulton plant since 1971. Having lost a representation election in September 1971, the Union began a new campaign in the summer of 1972. Sometime in the fall of 1972, Stockton was cleaning the break room when Farris Gregory, the plant personnel manager, entered the room to purchase a cup of coffee. At the hearing before the Administrative Law Judge, Stockton recounted the ensuing conversation:

> He got a cup of coffee at the vending machine and he turned around to me, and he said, "Rubel, I have been hearing some tales on you," and I said, "What's that, Farris?" He said, "I have heard from some of the boys that you have been loaning your car to boys to go to Union meetings." I just laughed and told him, I said, "Well, it's my car, I can do as I please." That was the extent of the conversation. He went on out.

4. The Board's Decision and Order are reported at 204 NLRB No. 105 (1973). This Court

Although Stockton testified that he did not consider the incident "a joke," he stated that Gregory smiled at him and that he returned the smile because "when a fellow is nice to me, I'm nice to him." Stockton further testified that no other persons heard the conversation and that, in fact, he had not been lending his car to persons to attend Union meetings.

At the conclusion of the hearing, the Administrative Law Judge ruled that the Company was guilty of creating the impression of surveillance of Union activity in violation of Section 8(a)(1) of the Act. The Administrative Law Judge based his decision upon two factors: (1) the unrefuted testimony of Stockton at the hearing, and (2) certain findings which the Board made in a prior case involving the Company.[4] In the case at bar, the Board affirmed the findings and conclusions of the Administrative Law Judge and adopted his cease and desist order.

The Company first contends that the conversation between Stockton and Gregory occurred more than six months prior to March 8, 1973, the date on which the charge against the Company was filed with the Board and, thus, any proceeding against the Company was barred by the Statute of Limitations established by Section 10(b) of the Act. Section 10(b) reads in part:

> . . . Provided, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made
>
> . . . . .

The Company argues that only an alleged violation of the Act which occurred after September 9, 1972, could be the subject of a charge filed on March 8, 1973, and the Company points out that Stockton testified that the conversation in question occurred " . . . around September or maybe October '72." The Board, adopting the Decision and Order

granted enforcement in NLRB v. Mueller Brass Co., 501 F.2d 680 (5th Cir. 1974).

of the Administrative Law Judge, found that the incident in question occurred in the "fall of 1972." The Statute of Limitations is an affirmative defense and, as such, must be proved by the party alleging same. In the case at bar, the Company offered no evidence in opposition to Stockton's testimony. The Company, therefore, has failed to establish that the conversation between Stockton and Gregory occurred prior to September 9, 1972.

■ The Company also argues that the Administrative Law Judge erred in allowing the Board to amend its complaint against the Company to conform the date of the incident in question to the testimony of Stockton. The Company, however, has been unable to demonstrate that it was in any way prejudiced by the amendment. We, therefore, dismiss this argument and proceed to the merits.

The Company contends that Stockton's testimony, standing alone, does not establish a *per se* violation of Section 8(a)(1). The Company additionally asserts that the Administrative Law Judge erred in taking judicial notice of the former proceeding between the Company and the Board which, at the time of the instant hearing, was before this Court on a petition for enforcement, arguing that the prior findings of the Board were not "final" for the purposes of notice because they were subject to rejection by this Court.

■ Section 8(a)(1) of the Act does not proscribe all surveillance of employee activities by the employer. The only surveillance, or impression of surveillance, which the Act prohibits is that which tends to interfere with, restrain, or coerce Union activities. NLRB v. Southwire Co., 429 F.2d 1050 (5th Cir. 1970), cert. denied, 401 U.S. 939, 91 S.Ct. 932, 28 L.Ed.2d 218 (1971). As we stated in Hendrix Mfg. Co. v. NLRB, 321 F.2d 100 (5th Cir. 1963),

> Surveillance becomes illegal because it indicates an employer's opposition to unionization, and the furtive nature of the snooping tends to demonstrate spectacularly the state of the employer's anxiety. From this the law reasons that when the employer either engages in surveillance or takes steps leading his employees to think it is going on, they are under the threat of economic coercion, retaliation, etc.

321 F.2d at 104–105, n. 7.

■ Stockton's testimony, in and of itself, does not prove that the Company created an impression of surveillance in violation of Section 8(a)(1) of the Act. Standing alone, without evidence of a background of antiunion animus or a widespread pattern of antiunion conduct on the part of the Company, Stockton's statements do not establish that the Company interfered with, restrained, or coerced Union activities in any manner. From Stockton's account of the smiling encounter at the coffee machine, the personnel manager might well have intended his remarks to reflect the Company's prounion sentiments. In fact, however, Stockton's testimony is not the sole evidence of the Company's alleged violation of Section 8(a)(1).

In order to supply a background of antiunion animus for Stockton's statements, the Administrative Law Judge took judicial notice of certain findings which the Board had made in a prior proceeding between the instant parties.[5]

---

5. The prior findings were:
(1) That respondent's plant manager, Tyonburner, was averse to organization of the employees by the Union.
(2) That respondent's industrial relations manager, Gregory, told an employee in September 1972, that Rogers' name was on the desk of every employer in the area as a "union pusher" and that, if he lost his job with respondent, he would be unable to get another in that area.

(3) That in September 1972, Gregory told another employee, after displaying some Union cards, that respondent knew what was going on and that Union adherents would have difficulty obtaining jobs with other area employers.
(4) That respondent's suspension and ultimate discharge of an employee, Blanton, for soliciting for the Union was unlawful.

Although the previous decision of the Board was before this Court on a petition for enforcement at the time of the administrative hearing in the instant case, it was not error for the Administrative Law Judge, or the Board in adopting the findings of the Administrative Law Judge, to take notice of that proceeding. In NLRB v. American Art Industries, Inc., 415 F.2d 1223 (5th Cir. 1969), we reviewed two separate proceedings involving the Board and American Art Industries, Inc. and held that it was proper for the trial examiner to take judicial notice of the first proceeding between the parties during the second. In the case at bar, we also note that, prior to oral argument, another panel of this Court granted enforcement of the Board's first order against the Company in all respects. Thus, the Company's argument that the findings of the Board in the prior proceeding might be overturned on review was mooted by the decision of this Court in NLRB v. Mueller Brass Co., 501 F.2d 680 (5th Cir. 1974).

Against a backdrop of the Company's antiunion sentiment, the question is whether Stockton's testimony constitutes substantial evidence that the Company created an impression of surveillance in violation of Section 8(a)(1). After a full review of the record, we are unable conscientiously to conclude that Stockton's statements substantially support a decision that the Company, through the actions of Personnel Director Gregory, created an impression of surveillance that interfered with, restrained, or coerced Stockton in the exercise of his Section 7 rights. The Act does not prohibit a conversation which merely acknowledges the employer's awareness of an employee's Union activities. Until surveillance, or the impression of surveillance, tends to cause interference with or restraint of an employee in the exercise of his statutory rights, it does not assume the proportions of an unfair labor practice under Section 8(a)(1) of the Act. There is no such evidence in this case.

Unquestionably, the findings which the Board made in the prior proceeding show that the Company was hostile to the Union. Hostility toward the Union, however, is not an unfair labor practice. With or without a background of antiunion animus on the part of the Company, it must be proved that the Company, under the instant circumstances, committed an unfair labor practice. On review, we find that the unrefuted testimony of Abe Rubel Stockton, even considered against the Company's prior antiunion sentiment, does not constitute substantial evidence that the Company created an impression of surveillance in violation of Section 8(a)(1). We therefore will deny enforcement of the cease and desist order.

### Suspension—Employee Rogers

James Roy Rogers was suspended for three days shortly prior to a Union election. The Company said Rogers falsified excuses for absenteeism. The Board held the Company was motivated to suspend Rogers because of his Union activities. The detailed facts are necessary to the understanding of these conflicting positions.

On March 4, 1973, Rogers was a machine operator in the Company's Fulton plant. During his fifteen months as an employee, Rogers had been both a Union activist and an excessive absentee. Prior to the incident which triggered his suspension, Rogers, a member of the Union's organizing committee, had worn Union buttons and distributed Union literature, had testified against the Company in the prior proceeding between the Board and the Company, and had been absent from work a total of twenty-one times. Rogers' supervisor, Foreman Everett Gunter, had spoken to Rogers about his attendance on one occasion prior to March 4, 1973.

On Sunday, March 4, the first day of Rogers' work week, Rogers' wife called the plant at 10:30 p. m. to report that her husband was sick and would not work that evening. Rogers worked the 11:00 p. m. to 7:00 a. m. shift. Raising

Rogers' total absences to twenty-two, this absence was the thirteenth which had occurred on a day on which the work week either began or ended. Specifically, Rogers' absence from the night shift on March 4, 1973, was the tenth Monday which Rogers had been absent during his tenure at the Company.

The following evening, March 5, the second day of the work week, Rogers reported to work as usual. At the beginning of his shift, Rogers approached Foreman Gunter while Gunter was giving out work assignments and mentioned that he might have to take a few days off for medical reasons. Gunter agreed to discuss the matter with Rogers at a later time. At approximately 12:00 p. m., Rogers attended a Company meeting for night shift workers where the Company's president spoke against the Union and where Rogers made certain remarks displaying his pro-Union sentiments.

Sometime after Rogers returned to his work station following the meeting, Foreman Gunter approached him and asked Rogers how he was feeling. Rogers stated that he was suffering from an infection. In response to an inquiry by Gunter, Rogers stated that his doctor was Dr. Ratliff and that he had last seen his doctor "today."

The following morning, Tuesday, March 6, Gunter instructed a plant secretary to check with Dr. Ratliff's office concerning Rogers' alleged visit. Receiving word from the secretary that Dr. Ratliff had no record of a visit by Rogers on Monday, March 5, Gunter spoke with Paul Stamper, the plant's general foreman, who directed Gunter to check with Rogers that evening to verify the doctor's name. In answer to Gunter's inquiry Tuesday night, Rogers again identified his doctor as Dr. Ratliff and, the following morning, Wednesday,

March 7, Gunter requested the plant secretary to check with Dr. Ratliff's office once again. When the secretary reported that there was no record of an office visit by Rogers to either of the doctors in the Senter-Ratliff Medical Center on Monday, March 5, Stamper told Gunter to verify the name of Rogers' doctor for the second time. Again, Rogers stated that his doctor was Dr. Ratliff.

During this period of time, John Williams, the Vice-President of Industrial Relations of the Company's parent corporation, was in Fulton to conduct a series of meetings with the plant supervisors. When Gunter informed Stamper that Rogers identified his doctor as Dr. Ratliff for the third time, Stamper discussed the matter with Williams. The decision was made to suspend Rogers pending the investigation of an alleged violation of a Company rule, which provides for disciplinary action for falsification of any "reports or records including personal absences, sickness . . . ." [6] Rogers, thus, was suspended on Thursday, March 8, 1974.

On March 9, the Company continued its investigation of Rogers' absence by placing a third call to Dr. Ratliff's office. When an associate of Dr. Ratliff confirmed that there was no record of a visit by Rogers on Monday, March 5, the decision was made to continue Rogers' suspension until March 13. In all, Rogers was suspended a total of three work days.

At the conclusion of the hearing, the Administrative Law Judge found that the Company knew of Rogers' pro-Union activities, that Rogers' suspension preceded a representation election on March 16, and that prior to the absence in question, the Company had never followed a procedure of investigating Rogers' absences due to illness and had only spo-

---

6. The Company's plant rules read in pertinent part as follows:

Any employee who fails to maintain, at all times, proper standards of conduct or who violates any of the following rules, shall subject himself to disciplinary action, including discharge.

. . . . .

Falsifying information on employment applications. Giving false information concerning employment qualifications. Falsifying time records, production records, employees' records or any other reports or records, including personal absences, sickness and production records, or falsely stating or making claims of injury.

radically followed a procedure with respect to other night shift employees. Taking judicial notice of the Board's findings in the previous proceeding as background evidence of both the Company's antiunion animus and the Company's awareness of Rogers' pro-Union sentiments,[7] the Administrative Law Judge concluded that the Company had suspended Rogers for his conspicuous involvement in Union activity in violation of Sections 8(a)(1) and (a)(3) of the Act. Although the Administrative Law Judge specifically found that the Company justifiably believed that Rogers had not visited Dr. Ratliff on March 5, the Administrative Law Judge rejected the Company's claim that the basis of Rogers' suspension was his falsification of an illness report. The Board affirmed the findings and conclusions of the Administrative Law Judge in regard to the Rogers' incident[8] and adopted the cease and desist order and the order to make James Roy Rogers whole for any loss of earnings suffered as a result of his suspension.

■■■■ In controversies involving employee discharges or suspensions, the motive of the employer is the controlling factor. NLRB v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965). Absent a showing of antiunion motivation, an employer may discharge or suspend an employee without running afoul of the fair labor laws for a good reason, a bad reason, or no reason at all. NLRB v. O. A. Fuller Super Markets, Inc., 374 F.2d 197 (5th Cir. 1967). If the specific employee happens not only to break a Company regulation but also to evince a pro-Union sentiment, that coincidence alone is not sufficient to destroy the just cause for his discharge or suspension. See NLRB v. Soft Water Laundry, Inc., 346 F.2d 930 (5th Cir. 1965). The Board must sustain its burden of showing evidence on the record as a whole which establishes a reasonable inference of causal connection between the employer's antiunion motivation and the employee's discharge.

In the case *sub judice*, Vice-President Williams testified concerning the Company's corporate practice on absenteeism:

We normally establish rules in our plant and then we go through a very thorough training session on their intent, how to apply them, and how to interpret the rules and so forth.

As part of this there are rules on absenteeism and we run an absentee control program throughout the company. All supervisors are instructed to inquire as to the absence of an employee everytime he is absent; "We missed you. Where were you?" If they give any information we can check to verify this.

This is part of keeping people aware that we are interested and we want them on the job. That's the reason we employ them.

As to the operation of the Company's absentee policy at the Fulton plant, General Foreman Stamper testified that he usually instructed his foremen to check on the reason for a worker's absence. Commenting that the Company placed particular emphasis on attendance during the night shift where absenteeism is an increased problem, Stamper recalled three incidents where investigations were conducted into the reasons for workers' absences. In all three, the Company found that the employees had falsified the excuses for their absences and, in all three, the workers were suspended. The three employees were Jimmy Strode who was suspended for falsely stating that his father had died, Jarvis McKinnie who was suspended for stating that his wife was in the hospital, and Willie Dixon who was terminated for stating that his wife was in the hospital.

---

7. See footnote 5, *supra*.

8. The Administrative Law Judge found that the Company also violated Section 8(a)(4) of the Act by suspending Rogers. The Board stated, "While Rogers gave testimony in the prior unfair labor practice proceeding against respondent (204 NLRB No. 105), there is insufficient evidence in this case that his testimony in fact supplied a motive for his suspension."

The Company explained that Willie Dixon was terminated when Strode and McKinnie were only suspended because Dixon had been suspended four times previously.

Rogers' night shift foreman, Everett Gunter, explained how he personally ascertained the reason for an employee's absence. Gunter stated that, when a man was absent, he spoke to him individually about his absence unless there was a death in the family or some other basis for the nonattendance which was a matter of common knowledge around the plant. Gunter testified that he did not investigate every excuse to insure that an employee had not falsified a report, rather Gunter explained that he limited his investigations to those workers who had poor attendance records or who evinced a "suspicious" attitude when he questioned them. Gunter enumerated three prior cases where the excuses which his workers offered for a workmiss were checked. The three employees were Paul Holcomb, James Moore, and Earl Hoyle. In the case of employee Earl Hoyle, the investigation led to a determination that Hoyle had not seen a doctor for his illness as he had told Gunter. Earl Hoyle, Gunter stated, was suspended for three days for falsifying attendance records.

Discrediting the testimony of Williams, Stamper, and Gunter, the Board found that the Company had followed a procedure of investigating absences due to illness only sporadically prior to the Rogers' incident. The Board noted that Donald Smith and Ronald Smith, brothers who worked on the night shift, and Otho Stevens, an employee who, like Rogers, worked under Gunter, testified that, on those occasions when they called in sick, no inquiry was made about their medical treatment or the name of their doctor. Based upon the statements of these witnesses and the testimony of Gunter to the effect that he had investigated the absences of only three employees prior to Rogers' absence, the Board found that the sole purpose of the Company's investigation was to find some colorable basis for an act of reprisal against Rogers for his prominence in the Union movement. The Board concluded, therefore, that the Company's suspension of Rogers for falsification of a sickness report was an unfair labor practice under Section 8 of the Act.

■ The sum and substance of an unfair labor practice under Section 8(a)(3) is employer discrimination. The Act prohibits an employer, "by discrimination in regard to hire or tenure of employment . . . to encourage or discourage membership in any labor organization." Under the Act, discrimination consists in treating like cases differently. NLRB v. Whitfield Pickle Co., 374 F.2d 576 (5th Cir. 1967).

The simple facts before us demonstrate that the cases of Donald Smith, Ronald Smith, and Otho Stevens are not "like cases" to that of James Roy Rogers. Donald Smith stated that he had been absent only twice in his three years of employment at the Company. Otho Stevens, who had worked for the Company for seven months, testified that he had been absent on two occasions, once when he had the flu with apparent symptoms and a second time when his child underwent an operation for which Stevens filled out insurance claims. Of the three employees, Ronald Smith had the poorest work attendance with ten or twelve absences over a period of approximately nineteen months. And Smith admitted at the hearing that his supervisor had asked him about his absences on occasion.

The total, combined number of absences of Smith, Stevens, and Smith does not equal Rogers' absentee record. In the course of fifteen months of employment at the Company, Rogers was absent a total of twenty-one times. Rogers' absence on Sunday, March 4, 1973, was not only his twenty-second absence but also his thirteenth absence on a day on which the work week either began or ended. Gunter had previously warned Rogers about his absenteeism and when Rogers' wife reported him sick on March 4, Gunter was justifiably concerned about

Rogers' absence. Under these circumstances, the Company cannot be said to have committed an unfair labor practice by investigating the facts of Rogers' absence.

 To follow the Board's lead in this case would be effectively to insulate every Union activist from investigation and discipline for violation of Company rules, especially at the time of a Union election. The law was not intended to provide such insulation.

In concluding that the Company violated Sections 8(a)(1) and (a)(3) by suspending Rogers, the Board placed great emphasis on the fact that General Foreman Stamper testified that he had no reason to doubt that Rogers was actually sick on Sunday, March 4. The Board suggested that, where an employee is actually ill, a false statement concerning a visit to his doctor would not violate the purpose of the rule. The Board stated,

> Thus, in the case of alleged illness, the rule is properly viewed as aimed at a misrepresentation as to the existence of such a condition, and not at any gratuitous elaboration on the nature of the illness or the treatment received therefor.

The Board surmised, therefore, that if the Company believed that Rogers was truly sick, it had no legitimate reason to make an issue out of Rogers' reference to a visit to his doctor.

 Any employer has the right to demand that its employees be honest and truthful in every facet of their employment. Absent an antiunion motivation, any employer has the right to discipline an employee for his dishonesty or untruthfulness. On the record as a whole, we find no substantial evidence to indicate that the Company treated the Rogers' incident differently from other incidents where employees falsified a report in violation of the Company rule. Accordingly, the enforcement of the Board's order as to the suspension of Rogers is denied.

Enforcement denied.