**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**FEDERAL PACIFIC ELECTRIC COMPANY, Respondent.**

No. 30177.

United States Court of Appeals, Fifth Circuit.

April 22, 1971.

Walter C. Phillips, Director, Region 10, N. L. R. B., Atlanta, Ga., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., Arline Mendelson, Attys., N. L. R. B., Washington, D. C., for petitioner.

James E. Fagan, Newark, N. J., Butzel, Eaman, Long, Gust & Kennedy, by William M. Saxton, Robert M. Vercruysse, Detroit, Mich., for respondent.

Before THORNBERRY and GODBOLD, Circuit Judges, and BOOTLE, District Judge.

BOOTLE, District Judge:

This case is before the court upon the application of the National Labor Relations Board pursuant to Section 10(e) of the National Labor Relations Act (hereinafter referred to as "the Act"), as

amended, (61 Stat. 136, 73 Stat. 519, 29 U.S.C. § 151 et seq.), for enforcement of its order issued against respondent Federal Pacific Electric Company (hereinafter referred to as "the company") on November 30, 1969, and reported at 179 NLRB No. 127.

The case arose as a result of a charge filed by the Communication Workers of America, AFL–CIO, on February 13, 1969, against respondent charging violations of Section 8(a) (1) and (3) of the Act resulting from the discharge of employee Harold J. Davis, a union member. The Board issued its complaint and Notice of Hearing. A hearing was conducted before a Trial Examiner on April 15, 1969. Following the hearing the Trial Examiner in his decision concluded that respondent had not engaged in unfair labor practices within the meaning of the Act and recommended that the complaint be dismissed in its entirety. Pursuant to the provisions of Section 3(b) of the Act as amended, the Board in connection with this case delegated its powers to a three-member panel. On November 26, 1969, this panel, with one member dissenting, issued its decision and order, finding, contrary to the Trial Examiner's decision, that respondent had violated Section 8(a) (1) of the Act by discharging Davis as an object lesson to discourage employees from engaging in concerted activity. The Board made no finding with respect to the alleged 8(a) (3) violation.

The question for us is whether or not the findings of the Board are supported by substantial evidence on the record when considered as a whole. If so, they are conclusive upon us regardless of how we would find if conducting de novo proceedings. 29 U.S.C. § 160(e). If not, it is our duty to set aside and refuse enforcement of the order of the Board. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S. Ct. 545, 95 L.Ed. 456 (1951); N. L. R. B. v. Florida Steel Corp., 308 F.2d 931 (5th Cir. 1962).

After a careful review of the evidence in the record, we find that there is no substantial evidence, considering the record as a whole, to support the Board's conclusion.

The chronology of events culminating in the discharge of Davis had its beginning on Friday, November 15, 1968, with a request by the Union President that a meeting of employees in the brake-weld department of respondent be held with management to discuss why one White had been made foreman over the department rather than their group leader Rollins. Davis was among the employees who attended the meeting. While he did not address the meeting as such, he made some remarks to his co-workers as to why he felt Rollins had not been made foreman. Essentially the remarks were to the effect that Rollins had not been promoted because he was too valuable to the company in the position he then held.

Following this meeting, some of the employees returned to their department, apparently not completely satisfied with the outcome of the meeting, and asked Rollins to get their checks so they could go home and come back on Monday when Plant Manager Salsman could see them. Davis was not a party to this request. The checks could not be obtained that day. On this day, subsequent to the above general meeting, Davis attended a small meeting of employees where certain pay grievances were discussed but Davis was not interested because he had recently received an incentive pay increase which the others had not and were discussing.

On the following day, Saturday, Salsman was informed of the Friday meeting and of the attempted walk-out by some of these employees. He was furnished the names of two who had participated. Davis' name was not one of them. He was further informed of the employee unrest in the weld department and that a management representative had promised that Salesman would meet with the employees on Monday.

On Friday evening, November 15, Davis injured his eye in a basketball game. Even so he reported to work the

following Monday morning and attended the meeting where Salsman talked to the employees in the brake-weld department. At this meeting Salsman explained to the employees that the promotion of personnel to a supervisory position was a management prerogative. While so explaining Salsman told the employees that if they believed in management they were an asset to the company and if not they were not an asset and could leave. It was shortly after this remark that Davis chose to leave and go to a doctor concerning his eye injury. He stood up and walked over to Rollins standing nearby and informed him of his desire to go to the doctor to which Rollins assented and Davis left the meeting.

Salsman, on noticing Davis' movement immediately thought Davis had decided to accept his invitation to leave and that he might thereby precipitate a walk-out. However, Salsman stated that when he noticed that Davis conversed with Rollins his immediate fears were allayed and he then thought that Davis was perhaps requesting an excusal, but that he still felt some concern and determined to check with Rollins concerning the abrupt departure. On consulting Rollins, he learned that Davis had left to see a doctor concerning the injury to his eye. Salsman requested Rollins to ascertain which doctor Davis was seeing. Salsman states his motive for making such a request was his concern over a job related injury and possible workman's compensation claim. The Board, however, asserts that this claim by Salsman is but a pretext to disguise anti-union motivation. On the following morning Davis returned to work whereupon Rollins inquired of him the name of the doctor who had treated Davis' eye. On being given the name, Rollins reported it as instructed. On further inquiry it developed that Davis had not visited the named doctor. This development gave rise to further investigation by Salsman during which a series of misstatements were given by Davis as to his whereabouts and activities on the following day revolving around his treating himself at home with medicine obtained from a drug store. Apparently no satisfactory resolution of the true state of affairs was forthcoming by the end of the day and Salsman directed that Davis be discharged. Without recounting in detail all the events that transpired that day suffice it to say that Salsman testified at the hearing that this series of apparently senseless misstatements by Davis caused him to expend a disproportionate amount of time in trying to unravel the truth and it was for this reason alone that he discharged Davis. The Trial Examiner credited Salsman's testimony in this regard and specifically found that Salsman "discharged Davis because he was annoyed by having to take time to consider Davis' senseless misstatements concerning what he had done to treat his eye injury in his attempt to explain his leaving work on November 18." The Board concluded however that the discharge was motivated by a desire to provide an object lesson to the other employees and that the entire series of events which culminated in the discharge was staged with such a desire in mind.

The reasons assigned by the respondent for the discharge are but a pretext to camouflage its real purpose, contends the Board. "It is our opinion that the key to Respondent's motivation in this case lies in Salsman's repeatedly accusing Davis of having walked out of the November 18 meeting, his questioning of Davis as to the 'unrest', and his post discharge statements to three employees that Davis, in part, was discharged because he walked out of the meeting." These statements to the three employees, states the Board, were "calculated to foster the belief among employees that the discharge was related to their demands concerning employment conditions." These factors, states the Board, "together with the threat of a walkout by weld department employees, Respondent's opposition to their demands, and the timing of the discharge in relation to Salsman's statement demonstrating that employees who opposed manage-

ment were unwanted, renders the conclusion inescapable that Davis was discharged as an object lesson to others in the weld department and a step in Respondent's effort to thwart employees from pressing their demands."

These findings by the Board were in direct opposition to those of the Trial Examiner who conducted the hearing. The Examiner after making specific credibility resolutions concerning the evidence adduced at the hearing determined that Salesman did

"not discharge Davis simply because he left Salsman's meeting with the employees on September 18 (November 18), nor even because he left work that day. Nor is there any reason to believe from the credible evidence and the findings already made, that he discharged Davis because of Davis' Union membership, his apparent support of the Union in attending the meeting with Salsman, his actual or apparent exercise of any right to engage in or refrain from engaging in any concerted activity protected by the Act, or even the possibility that his leaving work during Salsman's meeting with the employees on September 18 (November 18) might have triggered a protected general 'walkout' by the employees. Instead, as Salsman's credited testimony indicates and I conclude, he discharged Davis because he was annoyed by having to take time to consider Davis' senseless mis-statements concerning what he had done to treat his eye injury in his attempt to explain his leaving work on September 18 (November 18)."

In discussing the evidence the Examiner touched upon several of the factors later relied on by the Board, i. e., the accusations of leading a walkout and the post discharge statements to other employees, and concluded that they did not support the conclusion that the discharge was improperly motivated.

 Of course the Board is not required to accord the same weight to the findings of the Examiner as we must to

the findings of the Board. However, this does not mean that the Examiner's findings are not without weight in this court when we are seeking to determine whether there exists substantial evidence on the record as a whole to support the Board's findings. It is, of course, axiomatic that there may well be substantial evidence to support the Board's findings even though the Board disagreed with its Examiner. The landmark case of Universal Camera Corp. v. N.L.R.B., *supra* 340 U.S. at 496, 71 S.Ct. at 469, perhaps best illustrates the weight to be accorded to the Examiner's findings by courts when confronted with a situation such as we have here. There the Court stated:

"The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case."

See also N.L.R.B. v. Dal-Tex Optical Co., 325 F.2d 78 (5th Cir. 1963).

Credibility in this case plays a decisive role. If Salsman is to be believed, and the Trial Examiner did believe him, there was no anti-union animus motivating the discharge of Davis. On the other hand, if Davis is to be believed, and the Trial Examiner apparently discredited his testimony, then there *may* be some support for the inferences drawn by the Board. The Trial Examiner found that there was actually no inconsistency in the testimony of the other witnesses and that such testimony was consistent with his finding that there was no anti-union motivation behind

Davis' discharge.[1] As regards the testimony given by Salsman and Davis, the Examiner stated:

"Salsman himself appeared to be a generally credible witness although even he was at times confused in details. But, in my opinion, Davis was less reliable in his recollection and showed a tendency to draw unwarranted conclusions and present them as the substance of the material statements in the case. In view of the General Counsel's burden of proof, I have resolved doubts in favor of Salsman's general testimony * * *."

The Board asserts in its briefs that it relied on the same basic facts as the Examiner, that it did not overturn any credibility findings of the Examiner, and that its disagreement relates "solely to the inferences to be drawn from established facts." But, simple logic dictates that if the Board relies on the same basic facts as the Examiner and does not dispute the credibility resolutions of the Examiner it must accept all the facts as found by the Examiner including those which the Examiner established by way of credibility resolutions.[2] However, careful examination of the "evidence and findings" of the Examiner, including those dependent on his credibility resolutions, completely fails to support the inferences drawn by the Board. Even so, in keeping with our duty to review the record as a whole to determine whether there exists substantial evidence to support the Board, we have not relied solely on the findings of the Examiner but have in fact looked to the entire record, assisted by the Examiner's findings and credibility resolutions.

Ascribing proper weight to the credibility determinations of the Examiner, Universal Camera Corp. v. N.L.R.B., *supra*, the conclusion seems inescapable that no substantial evidence exists to support any inference of unlawful employer motivation. Substantial evidence is "more than a mere scintilla. It means such evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L.Ed. 126 (1938). Mere suspicions of unlawful motivation are not sufficient to constitute substantial evidence. Lozano Enterprises v. N.L.R. B., 357 F.2d 500 (10th Cir. 1966). It is incumbent upon the General Counsel of the Board to prove unlawful conduct and an unlawful purpose is not lightly to be inferred. "In the choice between lawful and unlawful motives, the record taken as a whole must present a substantial basis of *believable* evidence pointing toward the unlawful one." N.L.R.B. v. McGahey, 233 F.2d 406, 413 (5th Cir. 1956). (Emphasis added.) Seemingly

---

1. The Board draws inferences contrary to those of the Examiner from the testimony of these other witnesses. The Board seems to believe that their testimony fully supports its inferences. However, a careful examination of this testimony does not provide such support. This testimony must be considered along with that of the two primary witnesses here, Salsman and Davis. Such consideration reveals that the testimony of the witnesses other than Davis and Salsman conceivably support either version of the facts, and if the testimony of Salsman be credited, as it was by the Examiner, then the testimony of the other witnesses at the hearing is not inconsistent with his testimony, if indeed not fully supportive thereof.

2. The Board asserts in this regard that it need not regard "those findings (Examiner's credibility findings) based on subjective testimony of an employer as to his motivations for a discharge in the same light as credibility findings concerning objective testimony." Thus, asserts the Board, they may "refuse to follow its trial examiner where it conflicts with well supported and obvious inferences from the rest of the record." Overlooked by the Board, however, is the fact that not only did the Examiner credit the testimony of Salsman, management representative, but also specifically discredited the testimony of Davis. Further, we find no additional evidence that testimony credited by the Examiner conflicts with *well supported* and *obvious* inferences from the rest of the record.

arbitrary discharges, even if harsh and unreasonable, are not unlawful unless motivated by a desire to discourage protected union activity. Here the suspicions of two members of the Board, while not entirely groundless, contrary to the factual findings of the Examiner would constitute too slender a reed to support an enforcement order. Accordingly, the application of the Board is denied.