NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

FLORIDA STEEL CORPORATION,
Respondent.

No. 77–3432.

United States Court of Appeals,
Fifth Circuit.

Dec. 15, 1978.

Elliott Moore, Deputy Assoc. Gen. Counsel, Dave Fleischer, Atty., Michael Winer, Supervisor Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, N.L.R.B., Washington, D. C., for petitioner.

Jeffrey L. Gibbs, Washington, D. C., for United Steelworkers of America, AFL–CIO.

Hamilton & Bowden, Charles F. Henley, Jr., William H. Andrews, Jacksonville, Fla., for respondent.

Harold A. Boire, Director Region 12, N.L.R.B., Tampa, Fla., for other interested party.

Before GOLDBERG, Circuit Judge, SKELTON, Senior Judge *, and FAY, Circuit Judge.

SKELTON, Senior Judge.

This case is before the court on the petition of the National Labor Relations Board (the Board) pursuant to Section 10(e) of the National Labor Relations Act, as amended (61 Stat. 136, 73 Stat. 519, 88 Stat. 395, 29 U.S.C., § 151, et seq.) (the Act), for enforcement of its order issued against Florida Steel Corporation (the Company) on August 25, 1977, which is reported in 231 NLRB No. 117. The United Steelworkers of America, AFL–CIO (the Union) has intervened, in support of the Board's order.

This is a simple case where the facts are clear and the applicable law is well established. Concisely stated, the Company discharged employee Donald Bassett for cause in that he falsified his application for employment contrary to the Company rule proscribing such conduct, and by his falsifications showed himself to be dishonest. The Administrative Law Judge (ALJ) held that the Company had discharged Bassett because of his union activities in the Company's plant in Tampa, Florida, in violation of § 8(a)(3) and (1) of the Act, and ordered his re-instatement with interest containing an inflation factor on back pay, and issued a broad form of order to be applied on a company-wide basis. The Board approved the decision and order of the ALJ, except

* Senior Judge of the United States Court of Claims, sitting by designation.

that it substituted escalated interest for the inflation factor on back pay, with one member dissenting on this item. We have carefully examined the entire record and have concluded that the Board's order is not supported by substantial evidence on the record as a whole, and we accordingly deny enforcement.

The facts that show the Company is in the business of producing, manufacturing and distributing steel and steel related products. It has four steel mills in the southeastern part of the United States, one of which is located in Tampa, Florida. In 1971 Donald Bassett signed an application of the Company for employment as a crane operator at the Tampa plant. The application had two parts, namely, the first section showing his personal history, job interest, training, military history, and employment history, and the second section being a health history report. The first section executed and signed by Bassett contained the following provision:

"I voluntarily give the Florida Steel Corporation the right to make a thorough investigation of my past employment and activities; agree to cooperate in such investigation. _ _ _ *I agree* that the contents of this application form _ _ may be used by the Company in whatever manner it may wish, and *that any false answers or statements made by me on this application or any supplement thereto, or in connection with the above investigation, will be sufficient grounds for immediate discharge.*" (Emphasis supplied).

This first section of the application was completed and signed by Bassett on October 18, 1971. His answers to the questions on the form contained many falsehoods and outright misrepresentations, as will be discussed in detail below.

The second section of the application (the health history report) contained the following statement:

"*The above statements are true to the best of my knowledge and I understand and agree that any falsification or misrepresentation by me on this form is suf-*

*ficient cause for discharge.*" (Emphasis supplied).

Bassett signed this section of the application and delivered it to the Company. It contained false entries and misrepresentations as shown below.

The Company relied on the truth and accuracy of both sections of the application and hired Bassett as a crane operator in 1971. The Union began an organization campaign at the Tampa plant in 1973. Bassett signed a union card and became an avid union supporter at the plant at that time. All of this was well known to the Company, but it took no action whatever against Bassett because of his activities in favor of the Union.

Union elections were held simultaneously in the Traffic Division, the Mill Division, and the Rebar Division of the Tampa plant in February, 1976. The Union lost the elections by an overwhelming vote of from three to five to one. The Union filed objections and the Board set aside the elections and ordered new elections held.

In March, 1976, Bassett injured his back while working on the job, and, except for a few days, did not work again until August of that year. He filed a claim for workmen's compensation with the Hartford Insurance Group, which was the Company's insurer. Hartford investigated the claim and discovered that Bassett had a previous injury or disability to his back while working for Town & County Mobile Homes Sales and Salvage Yard in Great Bend, Kansas, in 1964. He was treated by chiropractor who told him he had a slipped disc. He lost about a week from work at the time. Hartford contacted the Company (Florida Steel Corporation) to see if it had any knowledge of the prior back injury. This inquiry was made in an attempt to make a claim against the State of Florida's Special Disability Fund. The Company had no knowledge of the prior back injury or disability of 1964. When Hartford made this inquiry, the Company checked the record section of Bassett's application (the health history report) described above which he executed in 1971 and found the following entry:

"Have you ever had [an] injury:

1. Back injury or disability   No ."

The Company then examined the rest of his application and found that Bassett had not listed Town & Country Mobile Home Sales and Salvage Yard of Great Bend, Kansas, as one of his prior employers. This prompted the Company to make a thorough investigation of all of the entries on his application. As a part of this investigation, the officials of the Company had several meetings and conferences with Bassett, the first of which occurred on September 14, 1976, as shown by testimony of the Company officials and by Bassett's time card that was prepared and kept by the Company in its regular course of business.[1]

As a result of this investigation, the Company discovered that Bassett had made many false statements and misrepresentations on his application for employment, and in some instances had knowingly, deliberately and intentionally lied in order to get the job by misleading the Company. Bassett admitted that this was true when he was confronted with the facts by the Company. At the trial, he again admitted that he had made the false statements on his application and that he had lied to deceive and mislead the Company.

The following false statements and untruths were made by Bassett on his job application as shown on the face of the application and by facts discovered by the Company in its investigation:

1. He stated on the application that he had never had a back injury or disability when in fact he had a back injury or disability in 1964 while working for Mobile Home Sales and Salvage Yard in Great Bend, Kansas, which was diagnosed by a chiropractor as a slipped disc, and which caused him to lose about a week's work.

2. He stated on the application that he had never had an ulcer or stomach trouble, when in fact he was treated for an ulcer at the company infirmary when he worked for Republic Steel.

3. He stated on the application that he was "laid off" when he worked for the Ormet Corporation, when in fact he was fired because he did not report for work for 6 days. He admitted that he deliberately concealed this from the Company for fear he would not get the job.

4. He stated on the application that he ceased working for Charlotte Metals because there was "no work," when the true facts were that he was fired for padding his payroll by creating overtime situations.

5. His application stated that he attended Reader High School 4 years and graduated in 1954, when actually he never attended that high school at all.

6. There was a 7-year gap in his employment history on the application.

7. He intentionally and wilfully failed to list 16 employers for whom he had worked, including the following companies, because, according to his admission at the trial, he was afraid that if he listed them he would not get the job:

(1) Town & County Mobile Home Sales & Salvage Yard in Great Bend, Kansas.

(2) Hiring hall of Sheet Metal Local 70 in Akron, Ohio.

(3) Boise Sheet Metal Company.

(4) Romano's Restaurant in Jacksonville, Florida.

(5) Bethlehem Steel Company in California.

(6) Size-Tec Oil Company in the oil fields of Kansas.

(7) Three or four unnamed companies in the Kansas oil fields.

(8) Barkley Mobile Homes in Florida.

8. He listed only 4 employers on his application for whom he had worked, namely Republic Steel, Ormet Corporation, Charlotte Metals and DeChaine Air Conditioning Company, giving the dates

1. This date was important to show that the Company talked to Bassett about the falsifications in his application the day before the Union called a meeting of the employees on September 15, 1976, which Bassett attended, to start a new campaign for another union election.

of his employment for each company. All of the dates listed were incorrect. For instance, he stated on the application that he worked for Ormet Corporation from 1966 to 1969 when in fact the correct dates were from 1958 to 1963.

Bassett admitted several times in his testimony at the trial that he deliberately and intentionally failed to list all of his employers on his application for employment because he was afraid he would not get the job if he did. For instance, the record contains the following question asked of him at the trial and his answer:

"Q. [A]nd isn't it true, Mr. Bassett, that one of the reasons you didn't put down all these jobs on that application was that you were afraid if Florida Steel knew that, that you would never have been hired?

A. That's correct."

The ALJ complimented Bassett for admitting he falsified his job application by saying:

"Mr. Bassett admitted rather candidly—I thought his testimony was very straight forward, very candid."

and again:

"I thought his testimony was very straight forward and candid in that respect."

If Bassett's admission of his wrongdoings was a virtue in the eyes of the ALJ, we fail to appreciate it. The fact that Bassett freely admitted his dishonest acts did not make them any less dishonest.

There is no question that Bassett deliberately falsified his job application for the purpose of misleading the Company. This is shown not only by the evidence, but also by the comments of the ALJ and also by Mr. Westheimer, the representative of the General Counsel, at the end of Bassett's testimony. The ALJ stated:

"Well, I think on the state of this record, *there's no question but what the * * Mr. Bassett deliberately falsified his application.* I disagree with you, Mr. Westheimer, in that respect. *I think the*

*record is very strong that he knowingly and willfully falsified his application."*

* * * * * *

*"He made some admissions* to some very hard questions which were, in fact: *That he did not put down * * * on purpose, he did not put down some of his past employers. And he didn't do it for a reason. The reason was: He didn't think he'd get hired if he did."* (Emphasis supplied.)

The General Counsel admitted that Bassett falsified his job application when he stated at the end of the trial:

"We're not denying, Mr. Bassett didn't deny that he put certain things down. * * * *Well, the reason he put down those things falsely was so he would get the job."* (Emphasis supplied.)

Furthermore, the ALJ, in his Analysis and Concluding Findings, found as a fact as follows:

"There is no question but what Bassett did make his misrepresentation on his application nor is there any question that at least he thought they were material. In fact, he candidly admitted on cross-examination that he failed to put down many previous employers because he was afraid that were the respondent to contact them, he would not be hired. The fact of the misrepresentations or their materiality is not an issue here."

We assume that the finding of the ALJ that "the misrepresentations or their materiality is not an issue here" means that the misrepresentations were shown conclusively to have been made by the overwhelming uncontradicted evidence and that they were material. In any event, we conclude that this was so. Consequently, the Company had just cause to discharge Bassett, not only because of his dishonesty in willfully falsifying his job application on material matters, but also because in doing so he violated a fixed rule of the company requiring the discharge of any employee for such a falsification.

The ALJ tried unsuccessfully to eliminate the Company rule by disposing of it on a

credibility basis with reference to the testimony of James Rogers, who was the Company's personnel supervisor. Rogers testified that the Company had an inflexible rule requiring the discharge of any employee who made material misrepresentations on his job application, and that Bassett was fired for violating that rule. The ALJ found that Rogers was not a credible witness, and that, consequently, the rule did not exist in 1971 or in 1976. Had Roger's testimony been the only evidence as to the existence and enforcement of the rule, the ALJ would have limited our authority to review his credibility ruling as such determination of a trial judge are usually binding on an appellate court unless contrary to the record as a whole. However, the record here is replete with evidence, other than the testimony of Rogers, that the Company had such a rule in 1971 when Bassett was hired and in 1976 when he was fired, and that it was enforced.

In the first place, both sections of the job application form had the rule stated thereon, as quoted above, and Bassett expressly agreed to the rule by signing both sections of the form.

In the next place Company officials, David Davis, Melting Supervisor, and John Kechal, Industrial Relations Manager, testified that the Company had the rule and that it was enforced.

Finally, convincing proof of the existence and enforcement of the rule was offered by the Company when it introduced into evidence the personnel files of 5 other employees who had been discharged, because, in the past, like Bassett, they had made material falsifications on their job applications. The job application misrepresentations of these 5 employees and their discharges are shown by their personnel files kept by the Company as follows:

1. L. G. Frye was employed on July 27, 1972, as a maintenance mechanic, but was terminated on August 1, 1972, when his reference check showed different employment dates for one employer and no record of employment for the other employer.

2. Iona G. Henderson was employed as keypunch operator on July 7, 1975, and was terminated on August 8, 1975. After working for the Company for approximately a month, she requested time off in order to see a chiropractor due to a prior back injury in 1973. It was only at that time the Company discovered the employee had failed to mention the previous injury on her application. She was then terminated for "misstatement on application."

3. D. L. Batchelder was hired as a driver on August 16, 1976, and was terminated October 24, 1976. Batchelder was noted by his supervisor as being "a good, dependable worker" while at Florida Steel and had received good references from his previous employers. However, his arrest record indicated he had been convicted in 1958 for manslaughter, which was not noted by the employee on his application. It was for that reason Batchelder was terminated.

4. In July 1976, L. Washington was terminated because he failed to list his previous employment with Florida Steel. He was terminated even though his personnel file indicates that John Shipp, load scheduler, knew Washington for about ten or twelve years and would vouch for him that he was honest, dependable and reliable. Another driver also knew Washington and recommended him as a "good man." Washington was told in his exit interview that the Company was concerned about applying this policy in a consistent manner and that was why he was being terminated.

5. V. B. Spivey was employed on March 27, 1972, and was terminated over a year later on March 14, 1973. This employee had indicated on his application that he was currently employed by Red Wing Carriers when, in fact, he had been discharged two days before as an undesirable employee. He had also failed to indicate a previous accident and that he had worked for a short period of time for Commercial Carrier. This information was discovered accidentally after the em-

ployee had worked for Florida Steel for over a year. As soon as the falsification was brought to the attention of his supervisor, Spivey was terminated.

All of this evidence, which we conclude is substantial, shows without question that the Company had a rule, practice and policy of terminating employees once it discovered they had falsified their employment applications. It is clear that Bassett was not treated any differently than the other employees. The ALJ attempted to distinguish the cases of the 5 discharged employees named above from that of Bassett by showing their misrepresentations were different to those made by Bassett and their periods of employment by the Company were not the same as that of Bassett. These arguments are not persuasive. The common denominator running through all of the cases, including Bassett's, was the fact that all of them made material misrepresentations on their job applications in violation of the Company rule and because of which all of them were fired. The efforts of the ALJ to distinguish the cases shows a distinction or unlikeness without a difference. Obviously, it would be a rare circumstance indeed for any two falsified job applications made at different times by different applicants to contain exactly the same misrepresentations. Likewise, it would rarely occur that the periods of employment of different falsifying employees would be identical before their misrepresentations are discovered by the Company and they are discharged. In fact, the falsifications and length of service of all of the 5 previously discharged employees are different in both respects.

It is particularly significant that the General Counsel did not show that a single employee who had made material misrepresentations on his job application was not fired but was kept on the payroll of the Company despite the falsification.

The ALJ quotes the witness Rogers as saying that Bassett was a good worker and the Company hated to lose him. The ALJ concluded from this testimony, which he found credible, that since Bassett was a good worker the Company must have fired him because of his union activities.[2] This argument is not persuasive. The evidence shows that all of the 5 other employees who were fired for falsifying their employment applications who had worked for the Company long enough to establish a work record showed they were good workers, yet they, like Bassett, were discharged because of their misrepresentations. Employee Frye worked for the Company only 5 days and had no work record. Iona Henderson worked only one month and had no work record with the Company. However, her file shows that a previous employer rated her as follows:

"Quality of work: Outstanding.
Quantity of work: Outstanding.
Attitude and attendance: Excellent.
Comments: Very dependable.
Comments: Extremely conscientious.
Comments: A valuable employee.
Comments: We will miss her when she leaves."

The Company rated Donald Batchelder as follows:

"He was a good, dependable worker."

There is a comment by the Company in Lonnie Washington's file as follows:

"He has a very good work record with Florida Steel."

Finally, the file of V. B. Spivey shows that the Company evaluated his work performance:

"Better than satisfactory."

Therefore, Bassett's good work record was no better than that of 4 of the other 5 employees, and does not prove that his discharge was discriminatory. He received exactly the same treatment that was given them and for the same reason.

**2.** It will be noted that Rogers is the same witness that the ALJ found not to be credible when he testified about the existence of the Company rule against falsifying a job application and Bassett's discharge when he violated it. It would appear that the ALJ used credibility when it favored the Union and rejected it when it supported the Company. We do not think the credibility of a witness depends on "whose ox is being gored."

The General Counsel argues that if the Company had an inflexible rule requiring the discharge of an employee who falsified his job application, it would have fired Bassett "on the spot" when it first learned of an untruth on his employment application. Instead, the Company conducted a thorough investigation and had several meetings with Bassett before discharging him. We do not consider this to be a valid argument. In the first place, the Company gave Bassett every opportunity to explain why he falsified his application. The Company should be commended for this consideration of an employee rather than condemned for it. In the next place, the record shows that the Company followed this same procedure and investigated the facts regarding the falsified job applications of the other 5 employees listed above who were discharged for the misrepresentations on their applications. Bassett was not singled out for any special investigation. He was treated the same as the others. Such investigations were reasonable, if not necessary, to determine whether the untruths on the applications were material. After all, what appears to be an untruth on an application could be no more than an error or a mistake and the employee should be allowed an opportunity to explain it if he can. Bassett was given that opportunity here, but all he could say was that he deliberately falsified his application with intent to mislead the Company. Actually, the job application that Bassett signed, which is quoted above, expressly authorized the Company to make a thorough investigation of his past employment and activities, and he agreed to cooperate in such investigation.

The argument of the General Counsel that the Company acted too slowly in discharging Bassett for falsifying his application was effectively answered by the First Circuit Court of Appeals in the case of *N. L. R. B. v. Fibers International Corporation*, 439 F.2d 1311, 1314 (1 Cir. 1971), involving a discharged employee. There the court said:

"The Board's brief says that this 'is a classic "pretext" case.' The fact is, it is more a classic Board rationalization case. *We are accustomed to the Board concluding that the employer must have been improperly motivated because it acted too slowly. E. g., N. L. R. B. v. Billen Shoe Co.,* n. 1, ante [397 F.2d 801], at 803; *N. L. R. B. v. Agawam Food Mart* [1 Cir. 1970, 424 F.2d 1045], n. 1, ante; cf. *Board of Publication of Methodist Church v. N. L. R. B.,* 6 Cir., 1962, 297 F.2d 379, 380. *In the case at bar it has achieved the millenium. Here the company is condemned for its haste. In the next breath it is criticized for its care."* (Emphasis supplied.)

It can be argued from this holding of the court in that case that the Board takes the "slow tack" or the "fast tack" in condemning the action of an employer in discharging an employee, depending on which serves its purpose to adjudge the employer guilty of violating § 8(a)(3) of the Act. In our case, the Board has applied the slow tack theory in order to rationalize that the Company was improperly motivated because it acted too slowly in discharging Bassett. We do not agree. As stated above, Bassett was entitled to explain any statement on his job application and the Company was justified in allowing him the opportunity to do so. The fact that he could not satisfactorily explain the untruths on his application could not be attributed to how fast or how slow the Company acted.

The Board attaches great significance to the fact that Bassett had worked for 5 years before his falsifications were discovered and, in effect, argues that this long period of service should insulate him from the rule and policy of the Company. We do not agree. Bassett was not only dishonest with the Company in the instant case in the particulars pointed out above, but also had been dishonest with prior employers, one of which fired him for dishonestly padding his payroll as to overtime worked, and another fired him for failing to report to work for a period of 6 days. The Company was justified in concluding that he had shown himself to be a liar and a cheat. The lapse of time did not make his dishonest acts any less dishonest. We fail to understand how the Board can contend otherwise.

Bassett was discharged for good and sufficient cause. In the first place, he had been dishonest with the Company which was sufficient cause for his discharge. We held in *N.L.R.B. v. Mueller Brass Co.*, 509 F.2d 704, 713 (5 Cir. 1975):

"Any employer has the right to demand that its employees be honest and truthful in every facet of their employment. Absent an antiunion motivation, any employer has the right to discipline an employee for his dishonesty or untruthfulness."

In the second place, Bassett flagrantly violated a rule of the Company, which justified the Company in firing him. He received exactly the same treatment that the other 5 employees received for falsifying their job applications, and none of them were union members. We said in *N. L. R. B. v. Mueller Brass Co., supra* :

"On the record as a whole, we find no substantial evidence to indicate that the Company treated the Rogers' incident differently from other incidents *where employees falsified a report in violation of the Company rule.* Accordingly, the enforcement of the Board's order as to the suspension of Rogers is denied." (Emphasis supplied.)

The ALJ and the Board held that the Company discharged Bassett because of his union activities and thereby violated § 8(a)(3) of the Act. In order to be guilty of violating § 8(a)(3) there must be discriminatory treatment of an employee. We held in *N. L. R. B. v. Mueller Brass Co., supra* :

"The sum and substance of an unfair labor practice under Section 8(a)(3) is employer discrimination. The Act prohibits an employer, 'by discrimination in regard to hire or tenure of employment . . to encourage or discourage membership in any labor organization.' Under the Act, discrimination consists in treating like cases differently. *NLRB v. Whitfield Pickle Co.*, 374 F.2d 576 (5th Cir. 1967)." (509 F.2d 712).

We held similarly in *Mueller Brass Co. v. N. L. R. B.*, 544 F.2d 815 (5 Cir. 1977)

"The essence of discrimination in violation of Section 8(a)(3) of the Act is in treating like cases differently." (544 F.2d 819).

In *Frosty Morn Meats, Inc. v. N. L. R. B.*, 296 F.2d 617, 621 (5 Cir. 1961), this court stated:

"*If, however, the misdeeds of the employee are so flagrant that he would almost certainly be fired anyway there is no room for discrimination to play a part.* The employee will not have been harmed by the employer's union animus, and neither he nor any others will be discouraged from membership in a union, since all will understand that the employee would have been fired anyway. *It must be remembered that the statute prohibits discrimination,* and that the focus on dominant motivation is only a test to reveal whether discrimination has occurred. *Discrimination consists in treating like cases differently.* If an employer fires a union sympathizer or organizer, a finding of discrimination rests on the assumption that in the absence of the union activities he would have treated the employee differently.

"*When an employee gives his employer as much reason to fire him as Judkins did,* by refusing to follow instructions and by giving not only his supervisors but also his fellow employees the impression that he was uncooperative, *there is no basis for the conclusion that the employer has treated him differently than he would have treated a non-union employee. As a speculative matter, it may or may not be true that union animus loomed larger in the employer's motivation than Judkins' shortcomings as a worker. But when the evidence of just cause for discharge is as great as it is here, the record as a whole does not support the conclusion that the discharged employee was deprived of any right because of union activities.* The power of reinstatement is remedial. It is not to penalize an employer for anti-unionism by forcing on the pay-roll an employee unfit to stay on the job.

When the principles enunciated in the above cited cases are applied to the facts in the instant case, it is clear that discrimination played no part in the firing of Bassett. His case was treated no differently than the other 5 described cases where there was no connection whatever with the Union.

Many court decisions uphold the right of an employer to discharge an employee who violates a rule of the Company. See *N. L. R. B. v. Mueller Brass Co., supra; Mueller Brass Co. v. N. L. R. B., supra; N. L. R. B. v. McGahey*, 233 F.2d 406 (5 Cir. 1956); *N. L. R. B. v. Birmingham Publishing Co.*, 262 F.2d 2 (5 Cir. 1958); and *N. L. R. B. v. Speed Queen*, 469 F.2d 189 (8 Cir. 1972). In the instant case there was a flagrant violation by Bassett of the Company rule against falsification of his job application. The Board itself has held that the discharge of an employee for falsification of an employment application is justified. *Whittaker Knitting Mills*, 207 NLRB 1019 (1973); *Big Three Industries, Inc.*, 192 NLRB 370 (1971); and *Western Publishing Co.*, 188 NLRB 245 (1971).

The case before us is much like the case of *Fiberfil, Division of Dart Industries*, 210 NLRB 1086 (1974). There an employee was discharged for violating a rule of the company. The company proved that 25 other employees had been discharged for violating the same rule. The General Counsel did not prove that any other employee in the same situation had not been discharged. The Board approved the discharge as lawful.

The ALJ and the Board held that the firing of Bassett by the Company was not reasonable. In so ruling, the Board overstepped its authority. The reasonableness of the discharge of Bassett was for the Company to decide, not the Board. So long as management does not run afoul of the law, it may discharge an employee at any time it sees fit. We have held many times that management is for management and, subject to the one exception, has complete freedom as the master of its own business affairs. We held in the *NLRB v. McGahey, supra*:

"*The Board's error is the frequent one in which the existence of the reasons stated by the employer as the basis for the discharge is evaluated in terms of its reasonableness.* If the discharge was excessively harsh, if lesser forms of discipline would have been adequate, if the discharged employee was more, or just as, capable as the one left to do the job, or the like then, the argument runs, the employer must not actually have been motivated by managerial considerations, and (here a full 180 degree swing is made) the stated reason thus dissipated as pretense, nought remains but anti-union purpose as the explanation. *But as we have so often said: management is for management. Neither Board nor Court can second-guess it or give it gentle guidance by over-the-shoulder supervision. Management can discharge for good cause, or bad cause, or no cause at all.* It has, as the master of its own business affairs, complete freedom with but one specific, definite qualification: it may not discharge when the real motivating purpose is to do that which Section 8(a)(3) forbids. *N. L. R. B. v. Nabors* [5 Cir., 196 F.2d 272], supra; *N. L. R. B. v. National Paper Co.* [5 Cir., 216 F.2d 859], supra; *N. L. R. B. v. Blue Bell, Inc.* [5 Cir., 219 F.2d 796], supra; *N. L. R. B. v. C. & J. Camp, Inc.*, 5 Cir., 216 F.2d 113, supra." (233 F.2d 412) (Emphasis supplied.)

This holding was quoted with approval by this court in *Schwob Mfg. Co. v. NLRB*, 297 F.2d 864, 870 (5 Cir. 1962). It is clear that so long as an employer does not do that which § 8(a)(3) forbids, it has full authority to hire and fire its employees at will for any reason whatever, and may determine where, when, why and how they will work, what their duties are, and how long they will be employed. In passing the Act, Congress never intended to authorize the Board to question the reasonableness of any managerial decision nor to substitute its opinion for that of an employer in the management of a company or business, whether the decision of the employer is reasonable or unreasonable, too harsh or too lenient. The

Board has no authority to sit in judgment on managerial decisions.

The Board holds here that Bassett was not fired for just cause but because of antiunion bias of the Company. We do not agree. We have searched the entire record in vain to discover any evidence that Bassett's discharge was antiunion motivated on the part of the Company. The record does not contain a single incriminating antiunion statement or act of the Company or any of its officials against the Union or Bassett in connection with his union activities or its investigation of his falsified job application and ultimate discharge. As a matter of fact, the Company completely ignored the Union and Bassett's union activities, and never at any time mentioned them to Bassett. Neither was it discussed by the officials of the Company among themselves in connection with Bassett's discharge. They testified that Bassett's union activities had nothing whatsoever to do with his discharge. This evidence was uncontradicted. Under these circumstances, there is no basis nor support in the evidence for the holding of the Board that his discharge was antiunion motivated. In fact the evidence points the other way. This holding of the Board is based on pure speculation, conjecture, and surmise on the part of the ALJ and the Board, and is not supported by substantial evidence on the record as a whole.

Obviously, the ALJ and the Board based their decision that Bassett's discharge was antiunion motivated solely on the general bias of the Company against the Union, as shown by its attitude in other cases filed by the Union in various plants of the Company. These other cases had no connection with the instant case. The Company contested all of them.

In a companion case to the one before us, namely, No. 77–3307, *Florida Steel Corporation v. NLRB*, reported in 233 NLRB No. 74, of which we can take judicial notice, argued before us the same day as the instant case, the General Counsel admitted that the Union had filed dozens of unfair labor charges against the Union in its other plants and that many of them were dismissed. The Company argues that the record in that case shows that many of the charges dealt with the same reoccurring issue, namely a quarterly wage review policy and whether or not it was to be applied at operations where the Union was certified or seeking to be certified as the bargaining representative. There were several such locations and the wage review policy was, as mentioned, quarterly, which means that there were ample opportunities for the Union to file unfair labor practice charges, i. e. once every three months at each of the locations in question. This is how it went for several years, says the Company, until there could be judicial review of the issues raised by charges filed in connection with the earliest of the quarterly wage increases. In these circumstances it was not at all difficult for the Union to compile a long record of such filings with the Board.[3]

Furthermore, the Company pointed out, in three cases the courts denied enforcement of a critical portion of the case, i. e. the issue of unlawful discharge of three employees.[4]

In three cases the Board's Administrative Law Judge dismissed the complaint against the Company in its entirety.[5]

The Company admits that there have been findings of unfair labor practices against the Company but says there has also been an extensive organizational cam-

---

**3.** *Florida Steel Corporation v. N. L. R. B.*, 538 F.2d 324 (4th Cir. 1976); *Florida Steel Corporation v. N. L. R. B.*, 178 U.S.App.D.C. 76, 543 F.2d 1389 (1976); *Florida Steel Corporation v. N. L. R. B.*, 534 F.2d 1405 (5th Cir. 1976); *N. L. R. B. v. Florida Steel Corporation*, 536 F.2d 1385 (5th Cir. 1976).

**4.** *Florida Steel Corporation v. N. L. R. B.*, 529 F.2d 1225 (5th Cir. 1976); *N. L. R. B. v. Florida Steel Corporation*, 544 F.2d 896 (5th Cir. 1977); *Florida Steel Corporation v. N. L. R. B.*, 551 F.2d 306 (4th Cir. 1977).

**5.** *Florida Steel Corporation*, 215 NLRB 97 (1974); *Florida Steel Corporation*, 11–CA–6165, et al.; *Florida Steel Corporation*, 12–CA–6871.

paign over the past several years, and that during this time the Union has flooded the Board with charges against the Company, the overwhelming majority of which were either withdrawn or dismissed. The record shows that when Bassett was discharged in the instant case, he filed a harassment charge against the Company, but dropped it as it was obviously without merit.

On the other hand, the General Counsel says that the Board has found that the Company has violated the Act in 13 cases as follows:

"This is the thirteenth case in which the Board has found that the Company violated the Act. The first twelve are cited by the Administrative Law Judge (A.2, fn.1). There have been two subsequent decisions finding further violations: *Florida Steel Corp.*, 231 NLRB No. 135, 96 LRRM 1173 (1978), application for enforcement pending, No. 78–1114 (C.A.4), and *Florida Steel Corp.*, 233 NLRB No. 74, 97 LRRM 1061 (1978), petition for review pending, No. 77–3307 (C.A.5).

"In nine cases, this Court and other courts have enforced the Board's orders in whole or in part. Three of the courts' decisions are published: *Florida Steel Corp. v. N. L. R. B.*, 529 F.2d 1225 (C.A.5, 1976), enfg. in part 215 NLRB 97 (1974); *Florida Steel Corp. v. N. L. R. B.*, 94 LRRM 2589 (C.A.4, 1977), enfg. in part 221 NLRB 1008 (1975), which reaffirmed 214 NLRB 264 (1974); *N. L. R. B. v. Florida Steel Corp.*, 544 F.2d 896 (C.A. 5, 1977), enfg. in part 220 NLRB 225 (1975). In six other cases, the Board's orders were enforced without published opinion. *Florida Steel Corp.*, 221 NLRB 371 (1965), enfd., 534 F.2d 1405 (C.A.5, 1976); *Florida Steel Corp.*, 222 NLRB 955 (1976), enfd., 536 F.2d 1385 (C.A.5, 1976); *Florida Steel Corp.*, 224 NLRB 587 (1976), enfd., 95 LRRM 2627 (C.A.5, 1977); *Florida Steel Corp.*, 220 NLRB 260 (1975), enfd. [178 U.S.App.D.C. 76] 543 F.2d 1389 (C.A.D.C., 1976); *Florida Steel Corp.*, 220 NLRB 1201 (1975), enfd., 538 F.2d 324 (C.A.4, 1976); and *Florida Steel*, 221 NLRB 554 (1975), modified, 226 NLRB 123 (1976), enf'd 96 LRRM 2791 (C.A.4, 1977)."

The ALJ and the Board have used this history of litigation between the Union and the Company in other cases to show that the Company was biased against the Union in the instant case. Having thus attributed a historical and general antiunion bias to the Company, they used such bias, standing alone, to hold that the discharge of Bassett was antiunion motivated. The Company readily admits that it does not approve of the Union and does not want it in its Tampa plant, but denies that this attitude had anything to do with the firing of Bassett. Substantial evidence on the record as a whole supports the Company's position in this regard.

The long history of the filing of charges by the Union against the Company in its various plants, many of which charges, but not all, were without merit, makes one wonder if the Union has been engaging in a vendetta against the Company for a long time in support of undisclosed Union purposes. On the other hand, the Company has been determined that the Union would not prevail in any of the cases filed against it by the Union. Thus, the controversy has gone on so long between them it reminds one of the legendary feud between the "Hatfields and the McCoys." The Union has been particularly active in the instant case. Its attorney was present at the trial and questioned and cross-examined witnesses. When the case was appealed to this court, the Union intervened and its attorney filed a brief and appeared at the hearing and made an oral argument. It appears from all these circumstances that the Union has its "feelings" in this case and sought punitive action against the Company. The Board has obligingly cooperated by its order. It is hoped that our decision in this case will bring a "breath of fresh air" into this long-standing controversy and cause both the Union and the Company to adopt a more reasonable attitude toward each other.

This court is a court of justice whose duty and obligation is to see that justice is done

in each case presented to it based on the facts in that particular case and the law applicable thereto. We propose to dispose of the instant case on that basis. This is in accord with our opinion in *N. L. R. B. v. Dan River Mills, Inc.*, 274 F.2d 381, 384 (5 Cir., 1960) where Chief Judge Brown, in speaking for the court, held:

> "A discharge becomes forbidden only if motivated by an unlawful purpose to discriminate against the Union or its adherents. *A general bias or a general hostility and interference, whether proved or conceded, does not supply the element of purpose. It must be established with respect to each discharge.*" (Emphasis supplied.)

It is clear that the general bias of the Company is not sufficient to support the decision of the Board in the instant case.

Remedies granted in other cases where the facts and records are not before us do not compel us to grant the same remedies, or any remedy at all, in this case. While we may look to other cases to determine if the Company is against the Union, that is not necessary here as the Company admits it.

In the instant case, the Company had a perfect right to be opposed to the Union and such opposition was not an unfair labor practice. We held in *N. L. R. B. v. McGahey:*

> "This is not to penalize the employer because of antiunion bias for *we recognize that antiunion bias, strong convictions against unions or opposition to the underlying philosophy of the Labor Management Relations Act is not itself an unfair labor practice. In a free democracy, it is the citizen, not the Government, who fixes his own beliefs.* The personal views of McGahey, or his colorful, forceful means of expression, do not, unless voiced in manner or circumstance warranting the inference of a purpose to thwart, impede or discourage the plain and statutory rights of employees, violate the law, or infuse power in the Board to coerce a change of heart. *N. L. R. B. v. Goodyear Tire and Rubber Co.*, 129 F.2d 661 (5 Cir., 1942) cert. dismissed, 319 U.S.

776, 63 S.Ct. 1026, 87 L.Ed. 1723; *N. L. R. B. v. Williamson-Dickie Mfg. Co.*, 130 F.2d 260 (5 Cir. 1942); *Jacksonville Paper Co. v. N. L. R. B.*, 137 F.2d 148 (5 Cir. 1943), cert. den., 320 U.S. 772, 64 S.Ct. 84, 88 L.Ed. 462; *N. L. R. B. v. Riverside Mfg. Co.*, 119 F.2d 302 (5 Cir. 1941). McGahey must, of course obey the law, but he need not believe in it. *He may carry the McGahey beliefs to a McGahey-marked grave.*" (233 F.2d 409). (Emphasis supplied.)

In the case before us, the Company proved that it had good cause to discharge Bassett. When this was done, the burden shifted to the General Counsel to prove that antiunion animus was the motivating cause of his discharge. The General Counsel wholly failed to sustain this burden. We held in *Federal-Mogul Corp. v. N. L. R. B.*, 5 Cir. 1978, 566 F.2d 1245 (1978):

> "The burden of proof in a case such as this is upon the General Counsel and requires that he present substantial evidence that the discharge came from improper motives. *Frosty Morn Meats, Inc. v. N. L. R. B.*, 296 F.2d 617 (5 Cir. 1961). Furthermore, mere suspicions of unlawful motivation are not sufficient to constitute substantial evidence. An unlawful purpose is not lightly to be inferred. *N. L. R. B. v. Federal Pacific Electric Company*, 441 F.2d 765 (5 Cir. 1971). *The employer does not have the burden of disproving the existence of unlawful motivation in discharging an employee.* See *N. L. R. B. v. Varo, Inc.* [425 F.2d 293 (5 Cir. 1970)], *supra*, and *N. L. R. B. v. Soft Water Laundry, Inc.*, 346 F.2d 930, 936 (5 Cir. 1965)." (Emphasis supplied).

The burden of explanation for the discharge of an employee is not on the employer, but on the General Counsel. We held in *N. L. R. B. v. McGahey, supra* :

> "*The employer does not enter the fray with the burden of explanation.* With discharge of employees a normal, lawful legitimate exercise of the prerogative of free management in a free society, the fact of discharge creates no presumption, nor does it furnish the inference that an

illegal—not a proper—motive was its cause. An unlawful purpose is not lightly to be inferred. In the choice between lawful and unlawful motives, the record taken as a whole must present a substantial basis of believable evidence pointing toward the unlawful one. (Cases omitted)." (233 F.2d 413) (Emphasis supplied.)

In *Clothing Workers, Midwest Regional Joint Board v. N. L. R. B.,* 183 U.S.App.D.C. 413, 564 F.2d 434 (1977), the court held:

"When good cause for discharge or suspension is clearly established, the burden is on the Board to show that anti-union animus was the motivating factor. (Citations omitted). The burden on the Board is not simply to discover some evidence of improper motive, but to find an affirmative and persuasive reason why the employer rejected the good cause and chose an illegal one. (Citation omitted). The mere existence of anti-union animus is not enough." (183 U.S.App.D.C. 419, 564 F.2d 440).

We have held many times that where good cause for the discharge of an employee is shown, as in the instant case, the fact that anti-union animus existed on the part of the employer does not make the discharge unlawful unless the General Counsel proves a causal connection between the anti-union attitude of the employer and the discharge. In this connection, we held in *N. L. R. B. v. O. A. Fuller Super Markets, Inc.,* 374 F.2d 197, 200 (5 Cir. 1967):

"Only if the Board adequately sustains its burden of producing evidence on the record as a whole which establishes a reasonable inference of causal connection between the employer's antiunion motivation and the employee's discharge can its order properly be enforced. See *NLRB v. Soft Water Laundry, Inc.,* supra, 346 F.2d [930] at 936; *Schwob Mfg. Co. v. NLRB,* 5th Cir. 1962, 297 F.2d 864, 868."

Again, in *N. L. R. B. v. Mueller Brass Co.,* supra, we stated:

"The Board must sustain its burden of showing evidence on the record as a whole which establishes a reasonable in-ference of causal connection between the employer's antiunion motivation and the employee's discharge." (509 F.2d 711.)

In the instant case the Board did not prove by substantial evidence, nor by any evidence at all, that there was a causal connection between the antiunion attitude of the Company and the discharge of Bassett.

The fact that Bassett broke a company rule, which gave the Company just cause to fire him, but also participated in union activities, was not sufficient, without more, to make his discharge unlawful. See *Federal-Mogul Corp. v. N. L. R. B.,* supra, where we said:

"In addition, the mere fact that a specific employee not only breaks the company rule but also evinces a pro-union sentiment alone is not sufficient to vitiate just cause for his discharge. *Mueller Brass Company v. N. L. R. B.,* 544 F.2d at 819."

Also, see *N. L. R. B. v. O. A. Fuller Super Markets, Inc.,* supra, where we held:

"If the specific employee happens to be both inefficient and engaged in union activities, that coincidence standing alone is insufficient to destroy the just cause for his discharge. *NLRB v. Soft Water Laundry, Inc.,* 5th Cir. 1965, 346 F.2d 930, 934." (374 F.2d 200).

Again, in *N. L. R. B. v. Mueller Brass Co.,* supra, we stated:

"If the specific employee happens not only to break a Company regulation but also to evince a pro-Union sentiment, that coincidence alone is not sufficient to destroy the just cause for his discharge or suspension. See *NLRB v. Soft Water Laundry, Inc.* 346 F.2d 930 (5th Cir. 1965)." (509 F.2d 711).

In the situation here where the employer had just cause to discharge Bassett, his discharge cannot be vitiated just because he was pro-Union and the Company was anti-Union. That was our holding in the similar case of *N. L. R. B. v. Birmingham Publishing Co.,* 262 F.2d 2, 9 (5 Cir. 1958) where we said:

"If a man has given his employer just cause for his discharge, the Board cannot

save him from the consequences by showing that he was pro-union and his employer anti-union."

Again, in *N. L. R. B. v. Winn-Dixie Stores, Inc.*, 410 F.2d 1119 (5 Cir., 1969), we held:

"But, this knowledge of union activity and participation coupled with anti-union animus would not, standing alone, warrant the Board's decision. There must be something more to warrant the pretextual charge." (410 F.2d 1120).

\*   \*   \*   \*   \*   \*

"The Act does not insulate an employee from discharge. It is only when anti-unionism is the motive for the discharge that the Act is violated. The burden of proof is carried only when substantial evidence pointing toward the unlawful motive appears from the record taken as a whole. *NLRB v. I. V. Sutphin, Co.-Atlanta, Inc.*, 5 Cir., 1967, 373 F.2d 890. That substantial evidence is lacking here.

"Enforcement DENIED." (410 F.2d 1121).

In *Schwob Mfg. Co. v. N. L. R. B.*, 297 F.2d 864, 871, we held that "Union membership is no guaranty against discharge."

We stated in *N. L. R. B. v. Speed Queen, supra*:

"But knowledge of union activity, and an anti-union attitude, does not necessarily lead to the conclusion that a discharge is pretextual.

'[W]here a proper motive for the discharge can as reasonably be inferred as an improper motive, the discharge should not be set aside by the Board where the more substantial evidence supports the proper motive.' *DC International, Inc. v. N. L. R. B.*, 385 F.2d 215, 220 (8th Cir. 1967); *N. L. R. B. v. Ace Comb Co.*, 342 F.2d 841, 847 (8th Cir. 1965).

"We find there to be no substantial evidence to support the Board's finding that the discharge was pretextual. To the contrary, the overwhelming direct evidence supports the proper motive alleged by Springstroh." (469 F.2d 194) (Emphasis supplied.)

In *N. L. R. B. v. Mueller Brass Co., supra*, it was held:

"To follow the Board's lead in this case would be effectively to insulate every Union activist from investigation and discipline for violation of Company rules, especially at the time of a Union election. The law was not intended to provide such insulation." (509 F.2d 713).

We have concluded above that the order of the Board, that the Company fired Bassett because his Union activities, is based on mere suspicion, conjecture and surmise. We have held many times that suspicion is not substantial evidence and will not alone support an order of the Board. In *Federal-Mogul Corp. v. N. L. R. B., supra*, we said:

"Mere suspicions of unlawful motivation are not sufficient to constitute substantial evidence. An unlawful purpose is not to be lightly inferred."

The court held in *N. L. R. B. v. Federal Pacific Electric Co.*, 441 F.2d 765 (5 Cir. 1971):

"Ascribing proper weight to the credibility determinations of the Examiner, *Universal Camera Corp. v. N. L. R. B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, *supra*, the conclusion seems inescapable that no substantial evidence exists to support any inference of unlawful employer motivation. Substantial evidence is 'more than a mere scintilla. It means such evidence as a reasonable mind might accept as adequate to support a conclusion.' *Consolidated Edison Co. v. N. L. R. B.*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). *Mere suspicions of unlawful motivation are not sufficient to constitute substantial evidence. Lozano Enterprise v. N. L. R. B.*, 357 F.2d 500 (10th Cir. 1966). It is incumbent upon the General Counsel of the Board to prove unlawful conduct and an unlawful purpose is not lightly to be inferred. 'In the choice between lawful and unlawful motives, the record taken as a whole must present a substantial basis of *believable* evidence pointing toward the unlawful one.' *N. L. R. B. v. McGahey*, 233 F.2d 406, 413 (5th Cir. 1956). [Emphasis in the text.] Seemingly arbitrary dis-

charges, even if harsh and unreasonable, are not unlawful unless motivated by a desire to discourage protected union activity." (441 F.2d 770). (Emphasis supplied.)

In *N. L. R. B. v. Fuller Super Markets, supra,* our opinion contained the following statement:

"To justify enforcement of an order of the Board the evidence must do more than merely create a suspicion of the existence of facts upon which the order is based. ——."

In the instant case, the Board has ordered Bassett reinstated to his former position with back pay, plus escalated interest above the customary 6%. Our reaction to the reinstatement part of the order, under the facts in this case, is much the same as that expressed by the court in *Mueller Brass Co. v. N. L. R. B., supra,* as follows:

"We are literally shocked by the conclusion of the Board that Rogers was discharged in violation of the Act and that he is entitled to be reinstated." (544 F.2d 815 at 819.)

See also *Federal-Mogul Corp. v. N. L. R. B., supra,* where we reached the same conclusion. As in that case, we hold that the reinstatement of Bassett would be punitive in nature. This is not permissible. We held in *Frosty Morn Meats, Inc. v. N. L. R. B., supra* :

"The power of reinstatement is remedial. It is not punitive. It is not to penalize an employer for anti-unionism by forcing on the pay-roll an employee unfit to stay on the job." (296 F.2d 617 at 621).

We conclude that the reinstatement of Bassett would be a gross miscarriage of justice. The First Circuit Court of Appeals reached the same conclusion in *N. L. R. B. v. Fibers International Corp., supra,* wherein the Board had ordered the reinstatement of a discharged employee. · The court said:

"We would consider it a gross miscarriage for the company to be saddled by Board action with this ill-behaved, not to mention perjurious, employee. If the Board wanted to overlook de Jesus' obvious misconduct vis-a-vis itself, that was

its affair. The Company was not obliged to be as forgiving. No evidence warrants a finding that the company's decision, although no doubt pleasing to it, *cf. N. L. R. B. v. Lowell Sun Pub. Co.,* 1 Cir., 1963, 320 F.2d 835, 842; *N. L. R. B. v. Birmingham Pub. Co.,* 5 Cir., 1959, 262 F.2d 2, 9, was not motivated by proper business considerations. The section 8(a)(3) order requiring reinstatement and back pay must be vacated." (439 F.2d 1314).

As to reinstatement of a discharged employee, the Act provides:

"No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause." (29 U.S.C.A., § 160(c)).

In the instant case, Bassett was clearly discharged for cause. Accordingly, the Board exceeded its authority and acted contrary to. the above mandatory provision of the Statute when it ordered him reinstated with back pay.

Our decision in *Frosty Morn Meats, Inc. v. N. L. R. B., supra,* where we held as follows is particularly applicable:

" * * * when the evidence of just cause for discharge is as great as it is here, the record as a whole does not support the conclusion that the discharged employee was deprived of any right because of union activities." (296 F.2d 617 at 621.)

The same reasoning is pertinent here.

As we stated in *N. L. R. B. v. Atkins Saw Division of Nicholson File Co.,* 399 F.2d 907, 910 (5 Cir. 1968), we are mindful of the fact that:

" * * * on review, 'Courts are not obliged to stand aside and rubberstamp their affirmance of administrative decisions they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.' *N. L. R. B. v. Brown,* 380 U.S. 278, 291, 85 S.Ct. 980, 13 L.Ed.2d 839 (1964)."

Furthermore, as stated in *N. L. R. B. v. Fuller Super Markets, Inc.,* supra, our scope of review does not:

" * * * require us to abdicate our responsibility to the extent of merely 'rubberstamping' our affirmance of the Board's decision when, after full review of the record, including the evidence opposed to the Board's views, we are unable conscientiously to conclude that the evidence supporting such decision is substantial. *Universal Camera Corp. v. NLRB,* supra, 340 U.S. [474] at 488, 71 S.Ct. [456] at 465, 95 L.Ed. [456] at 467; see *NLRB v. Brown,* supra, 380 U.S. [278] at 291, 85 S.Ct. [980] at 988, 13 L.Ed.2d [839] at 849." (374 F.2d 200.)

We hold that the Company had good cause to fire Bassett and that his discharge was not antiunion motivated; and that the order of the Board is not supported by substantial evidence on the record as a whole. Accordingly, enforcement of the Board's order is denied. In view of our disposition of the case, we do not reach nor decide the question of increased interest on back pay nor the correctness of the company-wide broad form of order issued by the Board.

ENFORCEMENT IS DENIED.